# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 9, 2015

Lyle W. Cayce
Clerk

————

No. 14-50928

————

WHOLE WOMAN'S HEALTH; AUSTIN WOMEN'S HEALTH CENTER; KILLEEN WOMEN'S HEALTH CENTER; NOVA HEALTH SYSTEMS, doing business as Reproductive Services; SHERWOOD C. LYNN, JR., M.D., on behalf of themselves and their patients; PAMELA J. RICHTER, D.O., on behalf of themselves and their patients; LENDOL L. DAVIS, M.D., on behalf of themselves and their patients,

> Plaintiffs-Appellees – Cross-Appellants

v.

KIRK COLE, M.D., Commissioner of the Texas Department of State Health Services, in his Official Capacity; MARI ROBINSON, Executive Director of the Texas Medical Board, in her Official Capacity,

> Defendants-Appellants – Cross-Appellees

---

Appeals from the United States District Court
for the Western District of Texas

---

Before PRADO, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:

Plaintiffs, Texas abortion providers, sued State of Texas officials ("the State")[1] seeking declaratory and injunctive relief against the enforcement of

---

[1] The Plaintiffs include Whole Woman's Health; Austin Women's Health Center; Killeen Women's Health Center; Nova Health Systems d/b/a Reproductive Services; and Sherwood C. Lynn, Jr., M.D., Pamela J. Richter, D.O., and Lendol L. Davis, M.D., on behalf of themselves and their patients. The Defendants are Kirk Cole, M.D., Commissioner of the Texas Department of State Health Services, and Mari Robinson, Executive Director of the Texas Medical Board, in their official capacities.

No. 14-50928

recent amendments to Texas's law regulating abortions. *See* 2013 Texas House Bill No. 2 ("H.B. 2").[2]   Plaintiffs challenge H.B. 2's physician admitting privileges requirement as applied to a McAllen and an El Paso abortion facility. Plaintiffs also challenge H.B. 2's requirement that abortion facilities satisfy the standards set for ambulatory surgical centers facially and as applied to the McAllen and El Paso abortion facilities.   The district court enjoined enforcement of both requirements "*as applied to all women seeking a previability abortion*," and as applied to the McAllen and El Paso abortion facilities. *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 676 (W.D. Tex. 2014) (emphasis added).   The State appeals the entry of declaratory and injunctive relief.[3]   Plaintiffs cross-appeal the dismissal of their additional equal-protection and unlawful-delegation claims.

After carefully considering the record in light of the parties' extensive written and oral arguments, we AFFIRM the district court's dismissal of the Plaintiffs' equal-protection and unlawful-delegation claims, AFFIRM in part and MODIFY in part the district court's injunction of the admitting privileges and ASC requirements as applied to McAllen, VACATE the district court's injunction of the admitting privileges requirement as applied to "all women seeking a previability abortion," and REVERSE the district court's facial injunction of the ASC requirement, injunction of the ASC requirement in the context of medication abortion, and  injunction of the admitting privileges and

---

[2] Act of July 12, 2013, 83rd Leg., 2d C.S., ch. 1, §§ 1–12, 2013 Tex. Sess. Law Serv. 4795–802 (West) (codified at TEX. HEALTH & SAFETY CODE ANN. §§ 171.0031, 171.041–.048, 171.061–.064, & amending §§ 245.010–.011; amending TEX. OCC. CODE ANN. §§ 164.052 & 164.055).

[3] As discussed more fully below, upon the State's motion, a panel of this court partially stayed the district court's judgment pending appeal. *See Whole Woman's Health v. Lakey*, 769 F.3d 285 (5th Cir. 2014).   Upon Plaintiffs' application, the Supreme Court vacated the stay in part. *See Whole Woman's Health v. Lakey*, 135 S. Ct. 399 (2014).

2

No. 14-50928

ASC requirements as applied to El Paso.

In plain terms, H.B. 2 and its provisions may be applied throughout Texas, except that Supreme Court precedent requires us to partially uphold the district court's injunction of the ASC requirement as applied to the Whole Woman's Health abortion facility in McAllen, Texas, and to uphold the district court's injunction of the admitting privileges requirement as applied to Dr. Lynn when he is working at the McAllen facility.

## I.  Jurisprudential Background

So that our decision may benefit from a full understanding of the pertinent historical and jurisprudential context, we begin by reviewing the regulation of abortion and related Supreme Court cases.

### A.  Roe v. Wade

The Supreme Court's modern abortion jurisprudence began in 1973 with the landmark case *Roe v. Wade*, 410 U.S. 113 (1973).  As with the case before us, *Roe* dealt with a challenge to Texas's regulation of abortion.  Texas's penal code made it a crime punishable by imprisonment to procure or attempt to procure an abortion unless medically necessary to save the life of the mother. *Id.* at 117–18 & n.1.  Unlike the law presently challenged, the Texas law was not of recent vintage.  First enacted in 1854 with few substantial modifications, it was a century old at the time of *Roe*.  *See id.* at 116, 119.  Nor was Texas's law unique; a majority of the states had similar laws.  *See id.* at 116, 118 & n.2.

Reviewing Texas's statute against a backdrop of varying state regulations of abortion, *Roe* assessed the states' interests in regulating abortion, acknowledging a legitimate interest in women's health:

> The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under

3

circumstances that insure maximum safety for the patient. This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of after-care, and to adequate provision for any complication or emergency that might arise.

*Id.* at 150. The Court likewise credited an interest in protecting potential life: "as long as at least *potential* life is involved, the State may assert interests beyond the protection of the pregnant woman alone." *Id.*

Most significantly, however, the Court recognized a constitutional right of privacy "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.* at 153. While "[t]he Constitution does not explicitly mention any right of privacy," *id.* at 152, the Court relied on its cases recognizing a right of personal privacy in other contexts, which it found to be rooted in the "Fourteenth Amendment's concept of personal liberty and restrictions upon state action," *id.* at 153.

Considering these competing concepts, the Court "conclude[d] that the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation." *Id.* at 154. It thus fashioned a constitutional framework that conditioned the states' ability to regulate abortion on a fetus's viability. It held that states may not proscribe abortion prior to viability—the point at which "the fetus then presumably has the capability of meaningful life outside the mother's womb." *Id.* at 163. After viability, generally at the end of the second trimester, states could proscribe or regulate abortion except when an abortion was necessary to preserve the life or health of the mother. *Id.* at 163–64. The Court drew this line because it believed the interest in potential life to be compelling only after viability. *See id.* at 163.

4

No. 14-50928

The Court drew a second line at the end of the first trimester of pregnancy. During the first trimester, states were precluded from interfering with a woman's choice to obtain an abortion. *Id.* From the beginning of the second trimester onward, *Roe* held that "a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health." *Id.* "Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like." *Id.* The Court drew this line because it believed the interest in the health of the mother became compelling only after the first trimester. *See id.* (crediting evidence "that until the end of the first trimester mortality in abortion may be less than mortality in normal childbirth"). Measured against *Roe*'s framework, Texas's law proscribing abortion at all stages of pregnancy was held unconstitutional. *Id.* at 166.

*B. The Supreme Court's Review of Abortion Regulations Following* Roe

In the approximately twenty-year period following *Roe*, it became a regular practice of the Supreme Court to consider the constitutionality of state abortion regulations. *Roe* was explicitly reaffirmed twice during this period, *see Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 759 (1986); *Akron v. Akron Ctr. for Reprod. Health, Inc.* (*Akron I*), 462 U.S. 416, 420 (1983), before its framework was modified in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). Because *Roe* allowed regulations during the second trimester that were "reasonably related to maternal health," 410 U.S. at 164, the Court had to determine the reasonableness of various health regulations. Some health-based regulations

5

extended into the first trimester, some regulations were based on an interest in potential life but extended into the first or second trimester, and other regulations were said to be justified by interests not recognized in *Roe*. As the Supreme Court reviewed these regulations, two considerations often played a part in the analysis: (1) whether the regulation placed a substantial obstacle in the path of a woman's choice to obtain an abortion;[4] and (2) whether the regulation was reasonably related to a legitimate government interest.[5]

Relevant here, the Supreme Court addressed various state laws regulating the facilities in which abortions are performed.[6] In *Doe v. Bolton*,

---

[4] *See, e.g.*, *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 828 (1986) (O'Connor, J., dissenting); *Simopoulos v. Virginia*, 462 U.S. 506, 520 (1983) (O'Connor, J., concurring in part and concurring in the judgment); *Akron v. Akron Ctr. for Reprod. Health, Inc.* (*Akron I*), 462 U.S. 416, 434–35, 445 (1983), *overruled in part by Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833 (1992); *id.* at 453 (O'Connor, J., dissenting); *Harris v. McRae*, 448 U.S. 297, 315 (1980); *Bellotti v. Baird* (*Bellotti II*), 443 U.S. 622, 647 (1979) (Powell, J., plurality opinion); *Maher v. Roe*, 432 U.S. 464, 473–74 (1977); *Bellotti v. Baird* (*Bellotti I*), 428 U.S. 132, 147 (1976).

[5] *See, e.g.*, *Hodgson v. Minnesota*, 497 U.S. 417, 436 (1990) (Stevens, J., plurality opinion); *Thornburgh*, 476 U.S. at 828 (O'Connor, J., dissenting); *Simopoulos*, 462 U.S. at 519; *Akron I*, 462 U.S. at 453 (O'Connor, J., dissenting); *McRae*, 448 U.S. at 324; *Doe v. Bolton*, 410 U.S. 179, 194 (1973); *see also Roe v. Wade*, 410 U.S. 113, 164 (1973) (allowing regulations during the second trimester that were "reasonably related to maternal health").

[6] While not as pertinent to this case, the Supreme Court has addressed various other abortion regulations. The Court has interpreted the Constitution to permit states and the federal government to allocate resources so as to fund childbirth, but not fund abortion or the providing of information about abortion—thus encouraging childbirth over abortion. *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 201–03 (1991); *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 507–10 (1989); *McRae*, 448 U.S. at 318; *Maher*, 432 U.S. at 474. The Supreme Court also upheld general informed consent provisions that required a woman to certify in writing that she consented to an abortion. *See Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 65–67 (1976). On the other hand, the Court struck down "abortion regulations designed to influence the woman's informed choice between abortion or childbirth" by requiring the giving of information that goes "far beyond merely describing the general subject matter relevant to informed consent." *Akron I*, 462 U.S. at 444–45, *overruled by Casey*, 505 U.S. at 881–83; *see also Thornburgh*, 476 U.S. at 760, 763, *overruled by Casey*, 505 U.S. at 881–83. The Court also struck down requirements that the information necessary for informed consent be provided by a physician twenty-four hours prior to the abortion, *see Akron I*, 462 U.S. at 448–51, *overruled by Casey*, 505 U.S. at 884–87, and that a woman obtain

6

410 U.S. 179 (1973), the Court considered a requirement that all abortions be performed "in a hospital licensed by the State Board of Health and also accredited by the Joint Commission on Accreditation of Hospitals" ("JCAH"). *Id.* at 184. The Court held that the requirement did not withstand constitutional scrutiny because it was "not based on differences that are reasonably related to the purposes of the Act in which it is found." *Id.* at 194 (internal quotation marks omitted). In so concluding, the Court explained that the JCAH standards were general hospital standards not specific to abortion and the state did not require that the performance of non-abortion surgeries be constrained to JCAH-accredited hospitals. *See id.* at 193. The Court further found the regulation unconstitutional under *Roe* because it applied to abortions performed during the first trimester. *Id.* at 195.

In *Akron I*, 462 U.S. 416, *overruled in part by Casey*, 505 U.S. 833, the Court parsed how stringently states could regulate abortion to protect a mother's health at different stages of pregnancy. It explained that even during the first trimester, "[c]ertain regulations that have no significant impact on the woman's exercise of her right may be permissible where justified by important state health objectives." *Id.* at 430. The Court required these regulations to "not interfere" with the doctor-patient consultation or the woman's choice to obtain an abortion. *Id.* During the second trimester, it allowed states to "regulate the abortion procedure to the extent that the regulation reasonably

---

consent from her spouse to obtain an abortion, *see Danforth*, 428 U.S. at 69. Furthermore, the Court declared unconstitutional laws that "impose a blanket provision . . . requiring the consent of a parent or person *in loco parentis* as a condition for abortion of an unmarried minor . . . . [I]f the State decides to require a pregnant minor to obtain one or both parents' consent to an abortion, it also must provide an alternative procedure whereby authorization for the abortion can be obtained." *Bellotti II*, 443 U.S. at 643 (internal quotation marks omitted).

relates to the preservation and protection of maternal health" and does not "depart from accepted medical practice." *Id.* at 430–31 (internal quotation marks omitted). The Court applied these principles to invalidate a city ordinance that only allowed abortions in facilities that were part of a full-service hospital. *See id.* at 432–33. The Court held the ordinance "place[d] a significant obstacle in the path of women seeking an abortion" in the form of higher costs to obtain an abortion, increased travel distances, and additional health risks due to increased travel. *Id.* at 434–35. Further, the Court found the health justification for the requirement undercut by "present medical knowledge" that abortions during the second trimester could safely be performed in a physician's office. *Id.* at 437.

In contrast, in *Simopoulos v. Virginia*, 462 U.S. 506, the Supreme Court upheld a state requirement that all second-trimester abortions be performed in a state-licensed "outpatient surgical hospital." *Id.* at 515. The Court explained that the law differed materially from that in *Akron I*:

> The requirements at issue [in *Akron I*] mandated that all second-trimester abortions must be performed in general, acute-care facilities. In contrast, the Virginia statutes and regulations do not require that second-trimester abortions be performed exclusively in full-service hospitals. Under Virginia's hospitalization requirement, outpatient surgical hospitals may qualify for licensing as "hospitals" in which second-trimester abortions lawfully may be performed.

*Id.* at 516 (citation and internal quotation marks omitted). Virginia's law required outpatient surgical hospitals to meet standards in the following categories: (1) "organization, management, policies, procedures, and staffing"; (2) "construction standards," including for "public areas, clinical areas, laboratory and radiology services, and general building"; and (3) "patient care services," including anesthesia, laboratory, pathology, sanitation, laundry,

physical plant, medical records, emergency services, and evacuation planning. *Id.* at 515–16 (internal quotation marks omitted).

The Court held that Virginia's outpatient-surgical-hospital requirement was "not an unreasonable means of furthering the State's compelling interest in protecting the woman's own health and safety." *Id.* at 519 (citation and internal quotation marks omitted). The Court explained that, "[i]n view of its interest in protecting the health of its citizens, the State necessarily has considerable discretion in determining standards for the licensing of medical facilities." *Id.* at 516. Unlike in *Akron I*, the Court concluded "[o]n their face, the Virginia regulations appear to be generally compatible with accepted medical standards governing outpatient second-trimester abortions." *Id.* at 517. The Court also saw "no reason to doubt that an adequately equipped clinic could, upon proper application, obtain an outpatient hospital license permitting the performance of second-trimester abortions." *Id.* at 518–19.

*C.* Planned Parenthood of Southeastern Pennsylvania v. Casey

Nineteen years after *Roe*, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), a divided Court revisited *Roe*. In a joint opinion, Justices O'Connor, Kennedy, and Souter announced the judgment of the Court and delivered the opinion of the Court as to some parts. *Id.* at 843–44. Although parts of the joint opinion were a plurality not joined by a majority of the Court, the joint opinion is nonetheless considered the holding of the Court under *Marks v. United States*, 430 U.S. 188, 193 (1977), as the narrowest position supporting the judgment.[7]

---

[7] *See Stenberg v. Carhart*, 530 U.S. 914, 952 (2000) (Rehnquist, C.J., dissenting) ("Despite my disagreement with the opinion, under the rule laid down in [*Marks*], the *Casey* joint opinion represents the holding of the Court in that case."); *K.P. v. LeBlanc*, 729 F.3d 427, 442 n.93 (5th Cir. 2013); *see, e.g.*, *Stenberg*, 530 U.S. at 921 (majority opinion) (applying *Casey*'s joint opinion).

No. 14-50928

The Court first reaffirmed *Roe*'s "essential holding" that before viability a woman has a constitutional right to choose to terminate her pregnancy.[8] *See* 505 U.S. at 870–71. The Court went on, however, to modify the jurisprudence, reasoning that the legitimate interests of the states as recognized in *Roe* were "given too little acknowledgment and implementation by the Court in its subsequent cases," which decided that "any regulation touching upon the abortion decision must survive strict scrutiny, to be sustained only if drawn in narrow terms to further a compelling state interest." *Id.* at 871 (citing by example *Akron I*, 462 U.S. at 427). The Court found it "an overstatement to describe [the abortion right] as a right to decide whether to have an abortion 'without interference from the State.'" *Id.* at 875 (quoting *Danforth*, 428 U.S. at 61). Those cases that struck down an abortion regulation, "which in no real sense deprived women of the ultimate decision. . . . went too far." *Id.* Thus, the Court concluded that, in practice, *Roe*'s trimester framework had not given proper effect to the states' legitimate interests, which the Court found exist *throughout pregnancy*. *See id.* at 872–73, 875–76.

Accordingly, the Court held that a law, to infringe the right recognized in *Roe*, must do more than simply make the right more difficult to exercise. It must impose an *undue burden* on the exercise of that right:

> Numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure. The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be

---

[8] The Court recognized that "time has overtaken some of *Roe*'s factual assumptions," because modern science and "advances in neonatal care have advanced viability to a point somewhat earlier." *Casey*, 505 U.S. at 860 (comparing *Roe*, 410 U.S. at 160, with *Webster*, 492 U.S. at 515–16).

enough to invalidate it.   Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.

*Id.* at 874.  "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877.  The Court also indicated that if a law does not impose an undue burden on a woman's right to choose an abortion, the law is constitutional so long as it is reasonably related to, or designed to further, a legitimate state interest:

> Unless it [imposes an undue burden] on her right of choice, a state measure *designed to* persuade her to choose childbirth over abortion will be upheld *if reasonably related to* that goal. Regulations *designed to* foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden.

*Id.* at 878 (emphasis added).  Stated more simply, *Casey* held that a law regulating previability abortion is constitutional if: (1) it does not have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus; and (2) it is reasonably related to (or designed to further) a legitimate state interest.  *See id.*

Overruling precedent, the Court applied this test to uphold the state's requirement that a physician provide the woman information on the risks of abortion, the gestational age of the child, alternatives to abortion, and available assistance if the woman chose to proceed to natural birth.  *See id.* at 881–83 (overruling *Akron I*, 462 U.S. at 444, and *Thornburgh*, 476 U.S. at 762). It found the requirement was "a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion," serving the state's "legitimate goal of protecting the life of the unborn." *Id.* at 883.  The Court concluded that "[t]his requirement cannot be considered a

substantial obstacle to obtaining an abortion, and, it follows, there is no undue burden." *Id.*[9]

The Court separately upheld a 24-hour waiting period requirement. It found it reasonable to conclude that "important decisions will be more informed and deliberate if they follow some period of reflection," and held that "[i]n theory, at least, the waiting period is a reasonable measure to implement the State's interest in protecting the life of the unborn." *Id.* at 885 (overruling *Akron I*, 462 U.S. at 450). The Court addressed the district court's finding that the 24-hour waiting period, combined with the driving distances to abortion providers, would often produce delays of more than one day, and "for those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others, the 24-hour waiting period will be particularly burdensome." *Id.* at 886 (internal quotation marks omitted). Despite acknowledging that "the waiting period ha[d] the effect of increasing the cost and risk of delay of abortions," the Court held that the findings did not demonstrate an undue burden. *Id.* (internal quotation marks omitted). The Court reasoned that, although the district court found the requirement imposed a heavier burden on some women, "[a] particular burden is not of necessity a substantial obstacle. Whether a burden falls on a particular group is a distinct inquiry from whether it is a substantial obstacle even as to the women in that group." *Id.* at 887.

The Supreme Court also facially invalidated Pennsylvania's requirement that, prior to obtaining an abortion, a married woman state that she notified

---

[9] The Court also upheld a requirement that a *physician* must provide the information. *See* 505 U.S. at 884–85 (overruling *Akron I*, 462 U.S. at 448).

her spouse that she planned to obtain an abortion. *See id.* at 887–98. In light of the domestic abuse that might result from some women notifying their spouses, the Court held that the requirement had the effect of placing a substantial obstacle in the path of a woman's choice to obtain an abortion:

> The spousal notification requirement is thus likely to prevent a significant number of women from obtaining an abortion. It does not merely make abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle. We must not blind ourselves to the fact that the significant number of women who fear for their safety and the safety of their children are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion in all cases.

*Id.* at 893–94. Pennsylvania argued that, even given this conclusion, the statute should not be *facially* invalidated because only 20% of women who obtained an abortion were married and 95% of those women voluntarily notified their spouses, resulting in the requirement affecting less than 1% of women seeking an abortion in Pennsylvania. *See id.* at 894. The Court rejected this argument and facially invalidated the requirement because "in a large fraction of the cases in which [it] is relevant, it [would] operate as a substantial obstacle to a woman's choice to undergo an abortion." *Id.* at 895.[10]

D. *Application of* Casey

Since *Casey*, the Court has applied the undue burden test three times. In *Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam), the Court reversed an injunction of Montana's requirement that only physicians perform

---

[10] The Court reasoned:

The analysis does not end with the one percent of women upon whom the statute operates; it begins there. Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.

*Id.* at 894.

abortions.   The Court concluded that the law did not create a substantial obstacle to abortion.  *See id.* at 973–74.  The Court also rejected the argument that an invalid purpose was proven by a lack of medical evidence:

> Respondents claim in this Court that the Montana law must have had an invalid purpose because all health evidence contradicts the claim that there is any health basis for the law. . . .  But this line of argument is squarely foreclosed by *Casey* itself.  In the course of upholding the physician-only requirement at issue in that case, we emphasized that "[o]ur cases reflect the fact that the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, *even if an objective assessment might suggest that those same tasks could be performed by others.*"

*Id.* at 973 (alteration in original) (quoting *Casey*, 505 U.S. at 885).

The two other post-*Casey* cases dealt with prohibitions on what has been termed partial-birth abortion, and the cases resulted in divergent conclusions. *Stenberg v. Carhart* involved a Nebraska law making it a felony to perform a partial-birth abortion unless necessary to save the life of the mother.  530 U.S. 914, 921–22 (2000).   The Supreme Court held that the law was facially unconstitutional for two reasons.  First, the Court found impermissible the lack of a health exception to allow for the partial-birth abortion procedure if necessary to preserve the life *or health* of the mother (as opposed to an exception solely to save the life of the mother, which the statute did contain). *Id.* at 930.    Although Nebraska argued that a health exception was unnecessary because other abortion procedures could be safely used, the Court found this argument contradicted by evidence presented in the district court. *Id.* at 931–37.  The Court explained that division of medical opinion on the subject favored a health exception.  *Id.* at 937.  Second, the Court held the law unconstitutional because it had the "effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" by encompassing

within its statutory definition not only partial-birth abortion, but also the abortion procedure most commonly used during the second trimester of pregnancy—dilation and evacuation ("D&E"). *Id.* at 938 (citation and internal quotation marks omitted).

*Gonzales v. Carhart*, 550 U.S. 124 (2007), upheld as facially constitutional the Partial-Birth Abortion Ban Act of 2003 ("the Act"), 18 U.S.C. § 1531, which Congress drafted in response to *Stenberg*. *See* 550 U.S. at 132–33, 141. Congress made factual findings that "[a] moral, medical, and ethical consensus exists that the practice of performing a partial-birth abortion . . . is a gruesome and inhumane procedure that is never medically necessary." *Id.* at 141 (alteration in original) (internal quotation marks omitted). Significantly, the Supreme Court interpreted the language of the Act to be more specific and precise than the language of the statute in *Stenberg*, such that it prohibited *only* partial-birth abortion and did not encompass the commonly used D&E procedure. *See id.* at 133, 150–56. The Act contained an exception if the procedure was necessary "to save the life of a mother," which tracked the Nebraska exception struck down in *Stenberg*. *Compare id*. at 141, *with Stenberg*, 530 U.S. at 921–22.

The Supreme Court applied *Casey*'s undue burden test, "assum[ing its] principles for the purpose of th[e] opinion." 550 U.S. at 146. The Court found, based on Congress's stated reasons for the Act and a "description of the prohibited abortion procedure," that the purpose of the Act was to: (1) "express[] respect for the dignity of human life"; and (2) "protect[] the integrity and ethics of the medical profession." *Id*. at 156–57 (internal quotation marks omitted). Referencing *Casey*, the Court held that the Act was grounded in a legitimate purpose because "government may use its voice and its regulatory authority to show its profound respect for the life within the woman." *Id*. at

157.   In explaining why *Casey*'s purpose prong was satisfied, the Court described a rational basis test:

> Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn.

*Id.* at 158.

The Court then applied *Casey*'s "effect" prong, asking whether the Act had the effect of imposing an undue burden by barring partial-birth abortion while not including a health exception.  *See id.* at 161–67.  The Court explained that "the Act would be unconstitutional, under precedents we here assume to be controlling, if it subject[ed] [women] to significant health risks."  *Id.* at 161 (alteration in original) (internal quotation marks omitted).  However, the Court noted "documented medical disagreement whether the Act's prohibition would ever impose significant health risks," *id.* at 162, and held that this medical uncertainty foreclosed facially invalidating the act based on an undue burden:

> The question becomes whether the Act can stand when this medical uncertainty persists.  The Court's precedents instruct that the Act can survive this facial attack.  The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty.
> . . . Physicians are not entitled to ignore regulations that direct them to use reasonable alternative procedures.  The law need not give abortion doctors unfettered choice in the course of their medical practice, nor should it elevate their status above other physicians in the medical community. . . .
> Medical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts.  The medical uncertainty over whether the Act's prohibition creates significant health risks provides a sufficient basis to conclude in this facial attack that the Act does not impose an undue burden.

*Id.* at 163–64 (citations omitted).

Accordingly, having concluded that the Act did not have the purpose or effect of imposing an undue burden on a woman's right to choose an abortion in a large fraction of relevant cases,[11] the Court upheld the Act against facial challenge. *Id.* at 167–68.

*E. This Court's Decision in* Abbott II

With this history in mind, in *Planned Parenthood of Greater Texas Surgical Health Services v. Abbott* (*Abbott II*)—an earlier case in which we addressed the constitutionality of the admitting privileges requirement in H.B. 2—we summarized those standards that are also applicable to this case:

> A trio of widely-known Supreme Court decisions provides the framework for ruling on the constitutionality of H.B. 2. In *Roe v. Wade,* the Court held that the Fourteenth Amendment's concept of personal liberty encompasses a woman's right to end a pregnancy by abortion. *Roe v. Wade*, 410 U.S. 113, 153 (1973). In *Casey*, the Court reaffirmed what it regarded as *Roe*'s "essential holding," the right to abort before viability, the point at which the unborn life can survive outside of the womb. *Casey*, 505 U.S. at 870, 878. Before viability, the State may not impose an "undue burden," defined as any regulation that has the purpose or effect of creating a "substantial obstacle" to a woman's choice. *Id.* at 874, 878. In *Gonzales*, the Court added that abortion restrictions must also pass rational basis review. *Gonzales*, 550 U.S. at 158 (holding that the State may ban certain abortion procedures and substitute others provided that "it has a rational basis to act, *and* it does not impose an undue burden" (emphasis added)).

748 F.3d 583, 589–90 (5th Cir.), *reh'g en banc denied,* 769 F.3d 330 (5th Cir. 2014).

---

[11] The Court acknowledged without deciding the issue of whether a facial challenge required showing that the law is unconstitutional in all circumstances or, as described in *Casey*, only in a large fraction of the cases in which the law is relevant. *See id.* at 167–68.

No. 14-50928

## II.  Factual and Procedural Background of this Case

Having set the stage, we now turn to the matters at issue in this case. In 2013, the State of Texas passed H.B. 2, which contained various provisions relating to abortions.   H.B. 2 has four primary provisions, of which the Plaintiffs challenge two.  The first challenged provision requires a physician performing an abortion to have admitting privileges at a hospital within thirty miles of the location where the abortion is performed (the "admitting privileges requirement").  *See* TEX. HEALTH & SAFETY CODE ANN. § 171.0031(a)(1) (West Supp. 2014).  We addressed an earlier facial challenge to this provision in *Abbott II*, 748 F.3d 583.[12]  The second provision requires all abortion clinics to comply with standards set for ambulatory surgical centers (the "ASC requirement").[13]  *See* TEX. HEALTH & SAFETY CODE ANN. § 245.010(a) (West Supp. 2014).  Clinics had until September 2014, nearly fourteen months after H.B. 2 was passed, to comply with the ASC requirement.  *Id.*  The Texas Legislature's stated purpose for enacting these provisions was to raise the standard and quality of care for women seeking abortions and to protect the health and welfare of women seeking abortions.  *See* Senate Comm. on Health & Human Servs., Bill Analysis, Tex. H.B. 2, 83d Leg., 2d C.S. 1 (2013).  H.B. 2 contains a "comprehensive and careful severability provision," *Abbott II*, 748 F.3d at 589, as do the implementing regulations.  *See* H.B. 2 § 10(b); 25 TEX. ADMIN. CODE § 139.9.

---

[12]  The admitting privileges requirement went into effect on October 31, 2013.  The district court enjoined the provision, but we stayed the injunction on October 31, 2013, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott (Abbott I)*, 734 F.3d 406, 419 (5th Cir. 2013), and thereafter vacated the injunction, *see Abbott II*, 748 F.3d at 605.

[13]  An ambulatory surgical center is "a facility that operates primarily to provide surgical services to patients who do not require overnight hospital care."  TEX. HEALTH & SAFETY CODE ANN. § 243.002(1) (West 2010).

Adopted in December 2013, the regulations implementing the ASC requirement mandate that abortion facilities satisfy the standards applicable to ASCs in addition to any standards specifically applicable to abortion facilities. *See* 25 TEX. ADMIN. CODE § 139.40; 38 Tex. Reg. 9577 (Dec. 27, 2013). The regulatory standards for ASCs fall into three categories: (1) operating requirements, including requirements for records systems, patient rights, quality assurance, staffing, and cleanliness, 25 TEX. ADMIN. CODE §§ 135.4–.17, 135.26–.27; (2) fire prevention and general safety requirements, *id.* §§ 135.41–.43; and (3) physical plant requirements, which include location, physical construction, electrical, plumbing, and HVAC requirements, *id.* §§ 135.51–.56.

Shortly after H.B. 2 was passed, some of the same parties named in this case[14] sued the State of Texas seeking to invalidate certain provisions of H.B. 2, specifically, the admitting privileges requirement and the provision requiring compliance with the FDA protocol for what is known as "medication abortions" (the use of drugs to induce an abortion rather than performing a surgical procedure) (the "medication abortion provision"). In that case, the district

---

[14] Planned Parenthood, the largest provider of abortion services in Texas, is not a party to this lawsuit, although it was a named plaintiff in *Abbott II*. Lamar Robinson, M.D. was a named plaintiff in *Abbott II* and was originally a named plaintiff in this case. However, on June 3, 2014, he filed a Notice of Voluntary Dismissal because he obtained admitting privileges at a hospital within thirty miles of the clinic at which he provided abortions.

Otherwise, Plaintiffs largely overlap with the plaintiffs in *Abbott II*. Whole Woman's Health, Austin Women's Health Center, Killeen Women's Health Center, and Dr. Richter were plaintiffs in *Abbott II*. 748 F.3d 583 Doctors Lynn and Davis were not parties in *Abbott II*, but Whole Woman's Health and Austin Women's Health Center, respectively, sued on their behalf. *See* Complaint, Doc. No. 1, ¶¶ 13–14, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, No. 1:13-CV-862-LY (W.D. Tex.) (stating that clinics were suing "on behalf of" their "physicians"). Reproductive Services was not a plaintiff in *Abbott II*, but Dr. Richter, its medical director and sole abortion-performing physician, was a plaintiff. *See id.* ¶ 21.

court granted relief to the plaintiffs in part, *see Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 951 F. Supp. 2d 891, 909 (W.D. Tex. 2013), and we first granted a stay, *see Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott* (*Abbott I*), 734 F.3d 406, 419 (5th Cir. 2013), and later affirmed in part and reversed in part, *see Abbott II*, 748 F.3d at 605. The time for seeking certiorari from the United States Supreme Court passed, and no petition was filed.  In that earlier challenge to H.B. 2, the Plaintiffs did not raise any issues regarding the ASC requirement.

Instead, they waited until April of 2014, one week after the adverse decision in *Abbott II*, to file this lawsuit challenging Texas's requirement that abortion facilities satisfy the standards set for ASCs.  Together with a facial challenge to the ASC requirement, they also challenged the admitting privileges requirement and the ASC requirement as applied to Whole Woman's Health's abortion facility in McAllen and Reproductive Services' abortion facility in El Paso.  In addition, the Plaintiffs challenged H.B. 2 on several other grounds, including that it denies equal protection, unlawfully delegates lawmaking authority, and constitutes arbitrary and unreasonable state action. Before trial, the district court granted the State's motion to dismiss claims based on these other grounds.

After a four-day bench trial employing a highly-abbreviated format for the presentation of evidence, the district court enjoined enforcement of the admitting privileges requirement and ASC requirement "*as applied to all women seeking a previability abortion,*" and as applied to the McAllen and El Paso abortion facilities.  *Lakey*, 46 F. Supp. 3d at 676, 687 (emphasis added). The district court also enjoined the ASC requirement as applied to medication abortions.  *Id.*

At trial, the parties stipulated to the following facts.  Seven ASCs in five

major Texas cities (Austin, Dallas, Fort Worth, Houston, and San Antonio) were licensed to perform abortions and would be able to continue providing abortions after the ASC requirement went into effect. No other facility in Texas licensed to perform abortions satisfied the ASC requirement, and, thus, these other facilities would be prohibited from performing abortions after the ASC requirement went into effect on September 1, 2014. The parties further stipulated that Planned Parenthood of South Texas planned to open an ASC in San Antonio in September 2014. The district court accepted these stipulated facts, stating that the ASC requirement would "reduce the number of licensed abortion-providing facilities to, at most, eight." *Id.* at 681.[15] The district court also found that Texas had over forty abortion clinics prior to H.B. 2, but the district court did not discuss whether some of these clinics may have closed for reasons unrelated to H.B. 2.[16] *See id.* Both parties offered expert testimony at trial as to the increased travel distances that women would face to obtain an abortion due to H.B. 2. The district court credited the testimony of the

---

[15] The State points out that it did not stipulate that *only* eight abortion facilities would remain in Texas, arguing that currently licensed abortion facilities that do not comply with the ASC requirement might buy, build, or lease a licensed ASC. The parties stipulated that there were "433 licensed ambulatory surgical centers in Texas." There was testimony at trial that Dr. Davis and Austin Woman's Health Center purchased land in Austin with plans to open an ASC in the future and that Reproductive Services hoped to open an ASC in San Antonio. The fact that there are currently licensed ASCs in Texas where abortions are performed and that abortion providers have plans to open more attests that it is indeed possible for abortion providers to comply with the ASC requirement. Conversely, the Plaintiffs offered testimony that their efforts to lease an existing ASC failed primarily due to hostility to abortion. The evidence thus showed that there will be *at least* eight licensed ASCs in Texas where abortions are performed.

[16] For example, we noted in *Abbott I* and *II* that abortion facilities had difficulty recruiting physicians with admitting privileges because a large proportion of physicians performing abortions were over the age of 60 and had already retired or were planning to retire. *Abbott I*, 734 F.3d at 415; *Abbott II*, 748 F.3d at 591. In addition, we noted that some physicians felt deterred by the terms of their existing employment or were concerned about private discrimination. *Abbott II*, 748 F.3d at 591, 599.

Plaintiffs' expert, Dr. Grossman, and found that, due to H.B. 2, "a significant number of the reproductive-age female population of Texas will need to travel considerably [farther] in order to" obtain an abortion. *Id.* at 681–82.

Regarding the ASC requirement, the Plaintiffs offered expert testimony that "abortions can be safely performed in office-based settings, such as doctors' offices and specialized clinics," and that "there is no medical basis for requiring facilities in which abortions are performed to meet ASC standards."[17] Despite H.B. 2's severability clause and the fact that many of the ASC standards seem benign and inexpensive, *see, e.g.*, 25 TEX. ADMIN. CODE § 135.52(e)(1)(F) ("A liquid or foam soap dispenser shall be located at each hand washing facility."), Plaintiffs conceded at oral argument that they made no effort to narrow their challenge to any particular standards of the ASC provision of H.B. 2 or its accompanying regulations. Instead, they ask us to invalidate the entire ASC requirement.

In opposition, the State offered expert testimony that the sterile environment of an ASC was medically beneficial because surgical abortion involves invasive entry into the uterus, which is sterile. Accordingly, the State's expert opined that abortion procedures should "be performed in an ASC where the higher standard of care is required so as to better protect the patient's health and safety."[18]

---

[17] Plaintiffs offered expert testimony that the ASC requirement's construction standards were "largely aimed at maintaining a sterile operating environment," which is not necessary for surgical abortion because "it entails insertion of instruments into the uterus through the vagina, which is naturally colonized by bacteria." Plaintiffs also offered expert testimony that abortion procedures do not necessitate large operating rooms or scrub nurses and circulating nurses, as are required for ASCs. The Plaintiffs' expert also explained that medication abortions do not involve surgery but entail the oral administration of medications; accordingly, the expert concluded that there is "no medical basis for requiring medical abortion to be provided in an ASC."

[18] The State's expert explained that other procedures requiring entry into the uterus,

Like the Plaintiffs, the district court made no effort to write narrowly, finding that the entirety of the ASC requirement was not medically necessary and that its burdens outweighed any benefits, including that: (1) "women will not obtain better care or experience more frequent positive outcomes at an [ASC] as compared to a previously licensed facility"; (2) "it is unlikely that the stated goal of the requirement—improving women's health—will actually come to pass"; and (3) "the severity of the burden imposed by both requirements is not balanced by the weight of the interests underlying them." *Lakey*, 46 F. Supp. 3d at 684.

Regarding the as-applied challenge to the admitting privileges requirement, the State offered expert testimony that this requirement leads to greater continuity of care and "assures peer-review of abortion providers by requiring them to be credentialed and hold admitting privileges at a local hospital, thereby protecting patients from less than qualified providers."[19] Conversely, the Plaintiffs offered testimony that abortion physicians were being denied admitting privileges, not because of their level of competence, but for various other reasons, including: outright denial of admitting privileges with no explanation other than that it "was not based on clinical competence,"

---

such as dilation and curettage, are traditionally performed in an ASC or hospital settings for that reason. The State's expert further explained that ASC requirements as to accountability and monitoring mechanisms ensure patient safety and that other requirements regarding follow up and continuity of care result in patients receiving a higher quality of care.

[19] The State's expert opined that the physician performing the abortion "is the most knowledgeable about the procedure and the patient," whereas an emergency room "physician has no prior relationship with the abortion patient and is unfamiliar with her medical history and personal preferences." Thus, it was the State's expert's opinion that the admitting privileges requirement would lead to greater continuity of care, increased quality of care, and fewer risks from complications. *See also Abbott II*, 748 F.3d at 595 ("Requiring abortion providers to have admitting privileges would also promote the continuity of care in all cases, reducing the risk of injury caused by miscommunication and misdiagnosis when a patient is transferred from one health care provider to another.").

and having not completed a medical residency even though the bylaws of the hospital did not require such. As with the ASC requirement, the district court ultimately found the admitting privileges requirement was not medically justifiable and that the burdens it imposed were not outweighed by any potential health benefits. *See id.* at 684–85.

The State appeals the entry of declaratory and injunctive relief. Plaintiffs cross-appeal the dismissal of their equal-protection and unlawful-delegation claims and the district court's failure to hold the ASC requirement unconstitutional as applied to future abortion providers. As part of its appeal, the State sought a stay of the district court's order pending resolution of the appeal, and a motions panel of this court stayed in part the district court's injunction. *See Whole Woman's Health v. Lakey*, 769 F.3d 285, 305 (5th Cir.), *vacated in part*, 135 S. Ct. 399 (2014). In turn, the Supreme Court modified this court's order pending full consideration of the appeal and maintained the status quo by continuing the district court's injunction of the ASC requirement as well as the district court's injunction of the admitting privileges requirement as applied to the McAllen and El Paso facilities. *See Whole Woman's Health v. Lakey*, 135 S. Ct. 399 (2014).[20]

---

[20] In its reply brief, the State argues for the first time that there is no longer an Article III case or controversy concerning the El Paso clinic because it has not yet reopened in light of the district court's injunction and the Supreme Court continuing that injunction pending appeal. We conclude that this issue is not moot as the State suggests. The El Paso abortion facility was no longer able to provide abortions after April 2014 because its physician, Dr. Richter, no longer had admitting privileges at a local hospital. The Plaintiffs returned the facility's license because they could not afford to pay its annual assessment fees while it was not generating revenue. The facility has not immediately resumed providing services because, during the four months that it was closed, it had to close its doors, lay off its staff, move its records and equipment into storage, cancel its contracts with vendors, and give up its lease and its license. The president of the organization that ran the facility testified that if it was successful in this lawsuit, it would "seek to reestablish a licensed abortion facility in El Paso." Because the admitting privileges requirement arguably contributed to the closure of the El Paso facility and there is uncontested testimony that the facility will seek to reopen

No. 14-50928

### III.  Standard of Review

We review the district court's factual findings for clear error, its legal conclusions *de novo*, and its ultimate decision to enjoin enforcement of H.B. 2 for abuse of discretion.  *See Abbott II*, 748 F.3d at 589.  In so doing, we are not bound by the determinations of the motions panel, which considered during an abbreviated proceeding whether an emergency stay should be granted.  *See Lakey*, 769 F.3d at 305; *Abbott I*, 734 F.3d at 419 (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 704 (5th Cir. 1997)).  Further, no guidance can be gleaned from the Supreme Court's vacating portions of the stay without explanation, as we cannot discern the underlying reasoning from the one-paragraph order.

### IV.  Admitting Privileges Requirement – Facial Challenge

By facially invalidating the admitting privileges requirement, the district court granted more relief than anyone requested or briefed.  *See Lakey*, 46 F. Supp. 3d at 677  ("[T]he two portions of Texas Health and Safety Code, Sections 245.010(a) and 171.0031(a)(1), create an impermissible obstacle *as applied to all women* seeking a previability abortion." (emphasis added)).  Not only was it inappropriate for the district court to grant unrequested relief in a constitutional challenge to a state law, *see Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 (5th Cir. 2014) (narrowing a district court's apparent facial relief, which the court held "was an overly broad remedy in an as-applied challenge"), *petition for cert. filed*, S. Ct. No. 14-997 (Feb. 18, 2015), but in so doing, the district court also ran directly afoul of the holding and

---

upon a favorable resolution of this case, the parties still have a concrete interest in this controversy such that it is not moot.  *See Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) ("As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." (internal quotation marks omitted)).

25

mandate of *Abbott II*, 748 F.3d at 598–600, and the principle of res judicata. *See Lakey*, 769 F.3d at 293. By granting a broad injunction against the admitting privileges requirement "as applied to all women seeking a previability abortion," the district court resurrected the facial challenge put to rest in *Abbott II*.[21] However much a district court may disagree with an appellate court, a district court is not free to disregard the mandate or directly applicable holding of the appellate court. *See United States v. Teel*, 691 F.3d 578, 582–83 (5th Cir. 2012) (describing the law-of-the-case doctrine and mandate rule). We need not spend more time on this well-settled proposition—which plaintiffs do not dispute—and, instead, VACATE this portion of the district court's order.

V.  ASC Requirement – Facial Challenge

*A.  Res Judicata*

The State of Texas argues that these Plaintiffs previously challenged H.B. 2 in *Abbott II* without addressing the ASC requirement and, therefore, res judicata bars the current facial challenge.[22] For their part, the Plaintiffs argue that they could not have brought a challenge sooner because they did not know how the statute would be implemented until the implementing regulations went into effect. The district court agreed with Plaintiffs and rejected the State's res judicata defense at the motion to dismiss stage. It also concluded that challenges to the admitting privileges requirement and the ASC requirement represent different claims and causes of action. We reverse.

---

[21]  The only exception to our disallowing the facial challenge in *Abbott II* was that we did not reverse the district court's injunction with respect to physicians whose application for admitting privileges was still pending at the time H.B. 2 went into effect. *See Abbott II,* 748 F.3d at 605.

[22] Although the State did not raise this argument in its briefing on the emergency stay motion, it did raise the issue in its motion to dismiss before the district court.

Res judicata bars any claims for which: (1) the parties are identical to or in privity with the parties in a previous lawsuit; (2) the previous lawsuit has concluded with a final judgment on the merits; (3) the final judgment was rendered by a court of competent jurisdiction; and (4) the same claim or cause of action was involved in both lawsuits. *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004). The Plaintiffs do not contest the first three elements of the State's res judicata defense, but contend that the "claims" are different. However, res judicata bars even unfiled claims if they arise out of the same transaction and "could have been raised" in the prior litigation. *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

Contrary to the district court's conclusion, the present facial challenge to the ASC requirement and the prior facial challenge to the admitting privileges requirement in *Abbott II* arise from the same "transaction[] or series of connected transactions." *Petro-Hunt*, 365 F.3d at 395–96 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24(1) (1982)). The challenges involve the same parties and abortion facilities; the challenges are governed by the same legal standards; the provisions at issue were enacted at the same time as part of the same act; the provisions were motivated by a common purpose; the provisions are administered by the same state officials; and the challenges form a convenient trial unit because they rely on a common nucleus of operative facts. *See id.* at 396 (describing the relevant considerations for the fourth prong of the res judicata analysis).

The Plaintiffs' assertion that they could not have previously challenged the ASC requirement because they did not know how it would be implemented until the regulations were set forth is disingenuous, particularly in this litigation. As Plaintiffs admitted at oral argument, they challenge H.B. 2 broadly, with no effort whatsoever to parse out specific aspects of the ASC

requirement that they find onerous or otherwise infirm.  H.B. 2 very clearly required facilities that perform abortions to meet the existing requirements for ASCs, which were spelled out well before the effective date of this provision and, more importantly, well before the date of the *Abbott II* lawsuit:  "On and after September 1, 2014, *the minimum standards for an abortion facility must be equivalent to the minimum standards adopted under Section 243.010 for ambulatory surgical centers*."  TEX. HEALTH & SAFETY CODE ANN. § 245.010(a) (emphasis added).  The law does not allow several bites at the same apple, even if from a different quadrant of the apple.  *See Southmark Corp. v. Coopers & Lybrand* (*In re Southmark),* 163 F.3d 925, 934 (5th Cir. 1999) ("[R]*es judicata*[] bars the litigation of claims that either have been litigated or should have been raised in an earlier suit."); David P. Currie, *Res Judicata: The Neglected Defense*, 45 U. CHI. L. REV. 317, 325 (1978) ("[T]o allow a party to advance arguments in a second proceeding that he could have made in a prior proceeding . . . imposes unnecessary costs on both opposing parties and the judicial system.").  We do not suggest here that future lawsuits against this provision based upon specific facts arising in the future would be barred (*i.e.*, as-applied challenges).[23]  However, given the broad nature of this litigation, we discern nothing material that evolved between the time H.B. 2 was passed and *Abbott II* was filed, on the one hand, and the time this lawsuit was filed, on the other, that justified dividing the litigation.[24]

---

[23]  Similarly, we conclude, *infra*, that the district court correctly ruled that res judicata does not bar the as-applied challenges here.

[24]  Plaintiffs argue that they did not know whether existing facilities would be "grandfathered."  Nothing in the language of the legislation allows "grandfathering" of existing abortion facilities.  Existing ASC facilities were already "grandfathered."  In any event, this argument would at most support only a challenge to the lack of "grandfathering," not the broad-based challenge actually filed and the broad relief granted.

Although rather obliquely presented, Plaintiffs may be arguing that the challenge to the ASC requirement would not have been ripe at the time *Abbott II* was filed in the district court. "[T]he ripeness inquiry focuses on whether an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention." *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010) (alteration in original) (internal quotation marks omitted). "To determine if a case is ripe for adjudication, a court must evaluate (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration. The fitness and hardship prongs must be balanced . . . ." *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). "A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical. . . . A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000).

Resolution of whether the ASC requirement is facially unconstitutional did not need to await promulgation of regulations that simply carried out the unambiguous mandate of H.B. 2. *Cf. Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) ("The question of pre-emption is predominantly legal, and although it would be useful to have the benefit of California's interpretation . . . , resolution of the pre-emption issue need not await that development."). This is especially true because H.B. 2's precise and mandatory language did not leave the Department of State Health Services discretion as to the standards that would apply to abortion facilities. *Cf. Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 262 (6th Cir. 2009) (en banc) (reasoning that the action did not depend on decisions made by state authorities, who did not have the discretion to change the impact

of the law at issue).  Instead, it is abundantly clear from H.B. 2 that all abortion facilities must meet the standards already promulgated for ASCs.  This inevitable application of the ASC standards to abortion facilities supports deciding its constitutionality prior to the promulgation of implementing regulations.  *See Pearson*, 624 F.3d at 684 ("'Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect.'" (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974))); *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1164 (11th Cir. 2008).  Indeed, for these reasons, at the time of *Abbott II*, a facial challenge to the ASC requirement would not have been "abstract or hypothetical."  *Orix*, 212 F.3d at 895 (citation omitted).  Importantly, Plaintiffs made no effort to parse the regulations or otherwise assert anything material in the district court or on appeal with respect to the facial challenge that was not known the day H.B. 2 passed.  The district court's broad-brush striking of the entire statute also reflects nothing that needed to await further developments following H.B. 2's enactment.

In addition to the fitness prong, the hardship-to-the-parties analysis supports the conclusion that this issue should have been resolved at the time of *Abbott II*.  It would have been in the interest of the non-ASC abortion facilities to know at the earliest possible time whether H.B. 2 was unconstitutional or whether they were required to begin making modifications or buying or renting space to comply with the ASC requirement.  *See Pac. Gas & Elec. Co*, 461 U.S. at 201–02.  It would have imposed a hardship on abortion facilities to require them to bring this challenge only after final agency regulations were promulgated, forcing them to either begin compliance measures or risk facing only a brief period to comply if the ASC requirement

was ultimately upheld upon later challenge. *See id.* Furthermore, trying this facial challenge separately from the two facial challenges brought in *Abbott II* imposed a hardship on the State by requiring it to defend H.B. 2 against constitutional challenge in a piecemeal and duplicative fashion. Accordingly, we conclude that the district court erred in its ruling on the res judicata defense to this facial challenge to the ASC requirement.

## B. *Merits*

Even if our conclusion as to res judicata is incorrect, the facial challenge to the ASC requirement fails on the merits as well. Thus, for the purpose of completeness, we address the facial challenge, assuming *arguendo* that res judicata does not bar the challenge.

### 1. Rational Basis

The stated purpose of H.B. 2 was to raise the standard and quality of care for women seeking abortions and to protect the health and welfare of women seeking abortions. *See* Senate Comm. on Health & Human Servs., Bill Analysis, Tex. H.B. 2, 83d Leg., 2d C.S. 1, 2 (2013). Relying on *Abbott II*, the district court concluded that both the admitting privileges and ASC requirements were rationally related to a legitimate state interest. We agree: *Abbott II* held that the admitting privileges requirement is supported by a rational basis, 748 F.3d at 593–96, and in this case, the State supported the medical basis for both requirements with evidence at trial. *See Lakey,* 769 F.3d at 294.[25] Plaintiffs do not argue differently and, instead, focus their attack on

---

[25] *See also Simopoulos,* 462 U.S. at 519 (concluding that Virginia's outpatient-surgical-hospital requirement for second trimester abortion was "not an unreasonable means of furthering the State's compelling interest in 'protecting the woman's own health and safety'" (quoting *Roe,* 410 U.S. at 150)); *Roe,* 410 U.S. at 163 ("Examples of permissible state [health regulations] are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to

whether the challenged provision has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877.

2. Purpose Prong

Texas's stated purpose for enacting H.B. 2 was to provide the highest quality of care to women seeking abortions and to protect the health and welfare of women seeking abortions.[26] There is no question that this is a legitimate purpose that supports regulating physicians and the facilities in which they perform abortions.[27] The district court found that this was not the real purpose of the law and instead concluded "that the ambulatory-surgical-center requirement was intended to close existing licensed abortion clinics." *Lakey*, 46 F. Supp. 3d at 685.

The district court first found an impermissible purpose from the fact that the implementing regulations did not provide licensed abortion facilities a grandfathering exception to the standards applicable to ASCs, even though a grandfathering provision applied to existing ASCs—what it described as "disparate and arbitrary treatment." *Id.* The State argues that the district court misunderstood the application of the ASC grandfathering provision

---

be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like.").

[26] *See* Senate Comm. on Health & Human Servs., Bill Analysis, Tex. H.B. 2, 83d Leg., 2d C.S. 1 (2013) ("H.B. 2 seeks to increase the health and safety of a woman who chooses to have an abortion by requiring a physician performing or inducing an abortion to have admitting privileges at a hospital and to provide certain information to the woman."); *id.* at 2 ("Moving abortion clinics under the guidelines for ambulatory surgical centers will provide Texas women choosing abortion the highest standard of health care.").

[27] *See Roe*, 410 U.S. at 150 ("The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient. This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of after-care, and to adequate provision for any complication or emergency that might arise.").

because it applies to all ASCs—including ASCs that currently provide abortions—such that they do not have to comply with new construction requirements as the ASC standards are modified. *See* 25 TEX. ADMIN. CODE § 135.51(a). In this regard, the State correctly points out that ASCs that provide abortions are treated no differently than any other ASC. *See Lakey*, 769 F.3d at 294. Even assuming *arguendo* there is some "disparate treatment," the lack of a grandfathering provision is simply evidence that the State truly intends that women only receive an abortion in facilities that can provide the highest quality of care and safety—the stated legitimate purpose of H.B. 2. Another consideration is that the impact of a lack of grandfathering is lessened by the legislature allowing nearly fourteen months for existing abortion facilities to comply. *See* TEX. HEALTH & SAFETY CODE ANN. § 245.010(a) (September 1, 2014, effective date).[28] In addition, because there are 433 ASCs in Texas, the legislature logically could have inferred that abortion providers could easily rent space at existing ASCs. The district court's inferences from the mere fact of the law itself are thus not supported.

The district court further found an impermissible purpose likely due to "the dearth of credible evidence supporting the proposition that abortions performed in ambulatory surgical centers have better patient health outcomes compared to clinics licensed under the previous regime." *Lakey*, 46 F. Supp. 3d at 685.[29] The district court erred in its conclusion. In *Mazurek*, the

---

[28] Further, the Plaintiffs do not argue that it is impossible for abortion providers to comply with the ASC requirement, only costly and difficult.

[29] The district court also inferred an impermissible purpose from the State's attorneys arguing that women in El Paso would not face an undue burden because they could simply travel to New Mexico, a state without a requirement that abortions be performed in an ASC. We agree with the State that an improper legislative purpose cannot be inferred from an argument raised by its lawyers more than a year after H.B. 2 was enacted.

No. 14-50928

Supreme Court rejected the argument that the law at issue "must have had an invalid purpose because all health evidence contradicts the claim that there is any health basis for the law." 520 U.S. at 973 (internal quotation marks omitted). Likewise, in *Gonzales*, the Court explained that legislatures have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty" and that medical uncertainty, as the record demonstrates is present here, does not lead to the conclusion that a law is unconstitutional. 550 U.S. at 163.

The Plaintiffs also argue that an impermissible purpose can be inferred from the effect of the law—the closure of a majority of abortion facilities in Texas. This argument is foreclosed by *Mazurek*, in which the Supreme Court explained that courts "do not assume unconstitutional legislative intent even when statutes produce harmful results." 520 U.S. at 972; *see Lakey*, 769 F.3d at 295 (citing *Mazurek*, 520 U.S. at 972); *cf. Casey*, 505 U.S. at 874 ("The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.").

Plaintiffs bore the burden of proving that H.B. 2 was enacted with an improper purpose. *See Abbott II*, 748 F.3d at 597. They failed to proffer competent evidence contradicting the legislature's statement of a legitimate purpose for H.B. 2. *See Mazurek*, 520 U.S. at 972 (noting that there must be "*some* evidence" of improper purpose); *see also Abbott II*, 748 F.3d at 597; *Lakey*, 769 F.3d at 294–95 (stating that the district court cited no record evidence of improper purpose). All of the evidence referred to by the district court is purely anecdotal and does little to impugn the State's legitimate reasons for the Act. Plaintiffs failed to prove that H.B. 2 "serve[s] no purpose other than to make abortions more difficult." *Casey*, 505 U.S. at 901.

34

3.  Effect Prong

Facial challenges relying on the effects of a law "impose a heavy burden upon the parties maintaining the suit."  *Gonzales*, 550 U.S. at 167 (internal quotation marks omitted).  In the abortion context, it is unclear whether a facial challenge requires showing that the law is invalid in all applications (the general test applied in other circumstances) or only in a large fraction of the cases in which the law is relevant (the test applied in *Casey*).  *See id.*; *Abbott II*, 748 F.3d at 588–89.  In both *Gonzales* and *Abbott II*, the challenged provisions were upheld because even the less deferential, large-fraction test was not satisfied.  *See Gonzales*, 550 U.S. at 167–68; *Abbott II*, 748 F.3d at 600.  Here, the district court facially invalidated both the admitting privileges and ASC requirements without so much as mentioning either test.  Instead, it based its holding on a finding that the two requirements worked together, along with other state requirements, to "effectively reduce or eliminate meaningful access to safe abortion care for a *significant, but ultimately unknowable, number of women* throughout Texas."  *Lakey*, 46 F. Supp. 3d at 686 (emphasis added).  This analysis runs afoul of *Casey*, *Gonzales*, and *Abbott II*, which require, at a minimum, a "large fraction."  *Lakey*, 769 F.3d at 296 (quoting *Abbott II*, 748 F.3d at 600); *see also Gonzales*, 550 U.S. at 167–68; *Casey*, 505 U.S. at 895.[30]

As support for its holding that H.B. 2's admitting privileges and ASC requirements constituted an undue burden, the district court also weighed the

---

[30] Plaintiffs cite the use of the phrase "significant number" in *Casey* as support for the district court's approach.  *See, e.g.*, 505 U.S. at 893–94 ("The spousal notification requirement is thus likely to prevent a significant number of women from obtaining an abortion.").  However, in *Casey*, unlike here, the Court went on to find that this significant number amounted to "a large fraction."  *Id.* at 895.

burdens and medical efficacy of these two requirements. *Lakey*, 46 F. Supp. 3d at 684 ("[T]he severity of the burden imposed by both requirements is not balanced by the weight of the interests underlying them."). In so doing, the district court concluded that H.B. 2 would not further the State's interests in maternal health and increased quality of care.[31] In defense of this approach, Plaintiffs argue that the two requirements at issue are unconstitutional unless they are shown to actually further the State's legitimate interests. We disagree with the Plaintiffs and the district court's approach.

In *Abbott II*, the district court similarly held that the admitting privileges requirement "does nothing to further" the State's interest in maternal health, although it performed this analysis as part of the rational basis inquiry. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 951 F. Supp. 2d 891, 900 (W.D. Tex. 2013). In *Abbott II,* we held that the inquiry was "wrong on several grounds" and explained that "the fundamental question is whether Planned Parenthood has met its burden to prove that the admitting privileges regulation imposes an undue burden on a woman's ability to choose an abortion." 748 F.3d at 590. *Abbott II* thus disavowed the inquiry employed by the district court:

> It is not the courts' duty to second guess legislative factfinding, improve on, or cleanse the legislative process by allowing relitigation of the facts that led to the passage of a law. Under rational basis review, courts must presume that the law in question is valid and sustain it so long as the law is rationally related to a legitimate state interest. As the Supreme Court has

---

[31] *See Lakey*, 46 F. Supp. 3d at 684 ("[W]omen will not obtain better care or experience more frequent positive outcomes at an [ASC] as compared to a previously licensed facility."); *id.* ("[I]t is unlikely that the stated goal of the [ASC] requirement—improving women's health—will actually come to pass."); *id.* ("The court finds no particularized health risks arising from abortions performed in nonambulatory-surgical-center clinics which countenance the imposition of the [ASC] requirement . . . .").

often stressed, the rational basis test seeks only to determine whether any conceivable rationale exists for an enactment. Because the determination does not lend itself to an evidentiary inquiry in court, the state is not required to prove that the objective of the law would be fulfilled.

748 F.3d at 594 (citations and internal quotation marks omitted).[32] In addition, in *Gonzales,* in the course of applying the effect portion of the undue-burden inquiry, the Court made clear that medical uncertainty underlying a statute is for resolution by legislatures, not the courts. *See* 550 U.S. at 163 ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty."); *id.* at 164 ("Medical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts."); *id.* at 166 ("Considerations of marginal safety, including the balance of risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends."). Thus, we conclude that the district court erred by substituting its own judgment for that of the legislature, albeit this time in the name of the undue burden inquiry. *See Lakey*, 769 F.3d at 297 ("Under our precedent, we have no authority by which to turn rational basis into strict

---

[32] As they did in *Abbott II*, Plaintiffs again argue that *Akron I* and *Barnes* require the more demanding approach employed by the district court. *Compare* Pls.' Br. 35–38 (citing, *inter alia*, *Akron I*, 462 U.S. at 430–31, and *Barnes v. Mississippi*, 992 F.2d 1335, 1339 (5th Cir. 1993)), *with* Brief of Plaintiffs-Appellees at 15–17, *Abbott II*, 748 F.3d 583 (No. 13-51008) (same). As we explained in *Abbott II*, *Casey* overruled major portions of *Akron I* and replaced *Akron*'s strict scrutiny test with the undue burden analysis. *See* 748 F.3d at 590 (citing *Casey*, 505 U.S. at 871). In *Barnes*, we described *Casey* as holding that "the constitutionality of an abortion regulation . . . turns on an examination of the *importance* of the state's interests in the regulation and the severity of the burden that regulation imposes on a woman's right to seek an abortion." 992 F.2d at 1339 (emphasis added). *Barnes* nevertheless examined the state's interest without considering the extent to which the challenged law furthered that interest and without conducting a balancing test. *See id.* at 1339–40; *Lakey*, 769 F.3d at 298.

scrutiny under the guise of the undue burden inquiry.").[33]

Turning to the direct application of the large fraction test to the facts of this case, the parties' arguments focused on the number of women who faced increased travel distances due to the closure of abortion facilities. In particular, the arguments centered around those women who would face travel distances (one-way) of over 150 miles in light of *Abbott II*'s holding that "an increase of travel of less than 150 miles for some women is not an undue burden under *Casey*." 748 F.3d at 598. The district court credited the testimony of the Plaintiffs' expert, Dr. Grossman, and found that: (1) after the admitting privileges requirement went into effect, approximately 400,000 women of reproductive age would face travel distances of more than 150 miles; and (2) once both the admitting privileges and ASC requirements went into effect,

---

[33] Plaintiffs filed a Rule 28(j) letter referencing the recent district court opinion in *Planned Parenthood of Wis., Inc. v. Van Hollen*, No. 3:13-cv-465, 2015 U.S. Dist. LEXIS 35389 (W.D. Wis. Mar. 20, 2015). This case follows the standards announced in *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 2841 (2014), which requires balancing the burdens imposed by a law against its medical benefits, and which we distinguished in *Abbott II*, 748 F.3d at 596. "In our circuit, we do not balance the wisdom or effectiveness of a law against the burdens the law imposes." *Lakey*, 769 F.3d at 297 (citing *Abbott II*, 748 F.3d at 593–94); *accord Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 604–09 (6th Cir. 2006); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 170–72 (4th Cir. 2000); *Women's Health Center of W. Cnty., Inc. v. Webster*, 871 F.2d 1377, 1380–81 (8th Cir. 1989). Even if some balancing were appropriate, we are unsure that the Seventh Circuit's balancing test—pursuant to which even a slight or *de minimis* burden could be "undue"—is faithful to *Casey*, which requires a *substantial* obstacle. *See Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 478 (7th Cir. 1998) (Manion, J., dissenting) ("To fail the undue burden test, the alternatives to the [outlawed procedure] must . . . present a substantial obstacle to a woman obtaining an abortion . . . [but] [t]here is no suggestion in the court's opinion that the risks are more than "*de minimis*."); *see also Casey*, 505 U.S. at 926 (Blackmun, J., dissenting in part) ("Our precedents and the joint opinion's principles require us to subject all non-*de-minimis* abortion regulations to strict scrutiny."); *cf. Goss v. Lopez*, 419 U.S. 565, 576 (1975) (noting that procedural due process analysis only applies when a deprivation is more than *de minimis*). In any event, and although we do not reach the issue here, we note that applying any balancing test would be difficult on this record because plaintiffs have not introduced evidence from which we could discern the number or fraction of reproductive-age women who would be burdened, unduly or otherwise.

approximately 900,000 women of reproductive age would face travel distances of more than 150 miles. *See Lakey*, 46 F. Supp. 3d at 681–82.

Although Dr. Grossman and the district court did not mention percentages or fractions, using the district court's finding that there were approximately 5.4 million women of reproductive age in Texas, *see id.* at 681, the following percentages and fractions are derived: (1) 7.4% or 1/13 of women of reproductive age faced travel distances of 150 miles or more after the admitting privileges requirement went into effect; and (2) 16.7% or 1/6 of women of reproductive age would face travel distances of 150 miles or more after both requirements went into effect.

The motions panel majority found that these numbers did not satisfy the large fraction test:

> Even assuming, *arguendo*, that 150 miles is the relevant cut-off, this is nowhere near a "large fraction." *See Abbott II,* 748 F.3d at 600. As discussed above, the *Casey* plurality, in using the "large fraction" nomenclature, departed from the general standard for facial challenges. The general standard for facial challenges allows courts to facially invalidate a statute only if "no possible application of the challenged law would be constitutional." *Abbott II*, 748 F.3d at 588. In other words, the law must be unconstitutional in 100% of its applications. We decline to interpret *Casey* as changing the threshold for facial challenges from 100% to 17%.

769 F.3d at 298; *see also Abbott II*, 748 F.3d at 598 (holding that 10% did not amount to a large fraction). We agree and adopt this reasoning.

In defense of the district court's judgment, the Plaintiffs hardly argue that these numbers amount to a large fraction. Instead, they try to shift the discussion to making the denominator not all women of reproductive age in Texas, but "the population of women for whom the law imposes a meaningful burden." They fail to specify what that number would be or how it might be

derived. In addition, the Plaintiffs' approach would appear to "make the large fraction test merely a tautology, always resulting in a large fraction. The denominator would be women that Plaintiffs claim are unduly burdened by the statute, and the numerator would be the same." *Lakey*, 769 F.3d at 299. In *Casey*, the Court explained that the denominator was the group of women to whom the law was "relevant" or a "restriction." 505 U.S. at 894–95. Because H.B. 2 applies to all abortion providers and facilities in Texas, and the Plaintiffs argued that abortion clinics all across the state would likely be required to close, we used all women of reproductive age or women who might seek an abortion as the denominator in *Lakey, Abbott II*, and *Abbott I. See Lakey*, 769 F.3d at 299 ("Here, the ambulatory surgical center requirement applies to every abortion clinic in the State, limiting the options for all women in Texas who seek an abortion. The appropriate denominator thus includes all women affected by these limited options."); *Abbott II*, 748 F.3d at 598, 600; *Abbott I*, 734 F.3d at 414. Plaintiff's new denominator is inconsistent with our binding decision in *Abbott II*.

In reaching its conclusion that H.B. 2's requirements imposed an undue burden on a significant number of women, the district court also found that travel distances combined with the following practical concerns to create a *de facto* barrier to abortion for some women: "lack of availability of child care, unreliability of transportation, unavailability of appointments at abortion facilities, unavailability of time off from work, immigration status and inability to pass border checkpoints, poverty level, the time and expense involved in traveling long distances, and other, inarticulable psychological obstacles." *Lakey*, 46 F. Supp. 3d at 683. On this point, we agree with the motions panel majority: "We do not doubt that women in poverty face greater difficulties. However, to sustain a facial challenge, the Supreme Court and this circuit

require Plaintiffs to establish that the law itself imposes an undue burden on at least a large fraction of women.  Plaintiffs have not done so here." *Lakey*, 769 F.3d at 299; *see Abbott I*, 734 F.3d at 415 (holding that "obstacle[s]" that are "unrelated to the hospital-admitting-privileges requirement" are irrelevant to the undue-burden inquiry in a facial challenge); *cf. McRae*, 448 U.S. at 316 ("The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency."); *Maher*, 432 U.S. at 474 (reasoning that "[t]he indigency that may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions is neither created nor in any way affected by the" state's regulation).  Moreover, even accepting the district court's finding on this point, it is not clear from the record what fraction of women face an undue burden due to this combination of practical concerns and the effects of H.B. 2.  *Cf. Casey*, 505 U.S. at 887 (noting, based on similar factual findings, that "[a] particular burden is not of necessity a substantial obstacle").

Finally, in reaching its holding, the district court also accepted the finding of Dr. Grossman that the ASCs providing abortions in Texas "will not be able to go from providing approximately 14,000 abortions annually, as they currently are, to providing the 60,000 to 70,000 abortions that are done each year in Texas once all of the non-ASC clinics are forced to close."  As the motions panel majority observed, Dr. Grossman's opinion "is *ipse dixit* and the record lacks any actual evidence regarding the current or future capacity of the eight clinics." *Lakey*, 769 F.3d at 300.[34]  Further, as the motions panel majority

---

[34] Dr. Grossman based his opinion on a chain of unsupported inferences.  *See Lakey*, 769 F.3d at 300.  First, he found that in cities with both ASC and non-ASC abortion facilities, some non-ASC facilities provided more abortions while some ASCs provided fewer abortions.

recognized, there does not appear to be any evidence in the record that the current ASCs are operating at full capacity or that they cannot increase capacity. *See id.* Thus, the district court's determination on this point is unsupported by evidence and, therefore, is clearly erroneous. *See id.*

Because the Plaintiffs failed to prove that the ASC requirement imposes an undue burden on a large fraction of women for whom it is relevant, we conclude that the district court erred in striking down the ASC requirement as a whole as facially invalid. *See Gonzales,* 550 U.S. at 167–68; *Abbott II,* 748 F.3d at 588–89, 598–600.[35]

## C. ASC Requirement and the Provision of Medication Abortion

In addition to challenging the ASC requirement as facially unconstitutional, Plaintiffs challenged the ASC requirement as

---

From the increased amount of abortions at some of the non-ASC facilities, Dr. Grossman concluded that there was an increased demand for abortions in that city. Conversely, Dr. Grossman found the decrease in the amount of abortions at some ASCs to be "likely indicative of their inability to increase capacity in the face of growing demand." Dr. Grossman ultimately concluded that this purported inability to increase capacity at ASCs "may be a result of the admitting privileges requirement."

There were similar problems with Plaintiffs' evidence in *Abbott II.* As we noted in *Lakey*:

> [A]n expert who was part of the same research team as Dr. Grossman offered similarly unsupported conjecture [in *Abbott II*] when predicting that, as a result of the *admitting privileges requirement,* approximately 22,000 women in Texas would be unable to obtain abortions. On cross-examination in [*Lakey*], Dr. Grossman admitted that his colleague's earlier predictions proved to be inaccurate. Dr. Grossman testified in [*Lakey*] that there had been a decrease of only 9,200 abortions and that the decrease could not be wholly ascribed to the admitting privileges requirement. Indeed, Dr. Grossman acknowledged on cross-examination that in his team's published, peer-reviewed article, the researchers qualified their findings by noting that they "cannot prove causality between the State restrictions and falling abortion rate."

769 F.3d at 300 n.16.

[35] Given our holding, we also reject the Plaintiffs' argument on cross-appeal that the district court erred by excepting from its facial injunction of the ASC requirement "abortion providers that seek to become licensed in the future."

unconstitutional statewide in the context of the provision of medication abortion (in which drugs, as opposed to surgical procedures, are used to induce an abortion).    On this claim, the district court concluded that the ASC requirement was invalid "specifically as applied to the provision of medication abortions," with the entirety of the district court's analysis being that in this context "any medical justification for the requirement is at its absolute weakest in comparison with the heavy burden it imposes." *Lakey*, 46 F. Supp. 3d at 686.  The State appeals this portion of the district court's judgment, pointing out that the district court's conclusion is improperly based solely on its belief that the law is medically unjustified.

The Plaintiffs do not respond with any arguments on appeal in support of this portion of the judgment.  For the same reasons that we hold the district court erred in facially invalidating the ASC requirement, we conclude that the record and district court's opinion do not justify statewide invalidation of the ASC requirement in the context of medication abortions: (1) res judicata bars this claim, as it arises out of the same transaction as the claims in *Abbott II* and it "could have been raised" in *Abbott II*, *Allen*, 449 U.S. at 94; and (2) the ASC requirement in the context of medication abortion is rationally related to a legitimate state interest and has not been shown to have an improper purpose or impose an undue burden on a large fraction of women for whom it is relevant, *Gonzales*, 550 U.S. at 167–68.

## VI.  As-Applied Challenges

In *Abbott II*, we rejected the facial challenge to the admitting privileges requirement but noted that an as-applied challenge to the Rio Grande Valley (which is comprised of Starr, Hidalgo, Willacy, and Cameron County,

hereinafter collectively, "Rio Grande Valley")[36] may be appropriate based upon the evidence presented in that case. *See Abbott II*, 748 F.3d at 589 ("Later as-applied challenges can always deal with subsequent, concrete constitutional issues."). Plaintiffs have thus asserted such an as-applied challenge related to a facility in McAllen, as well to a facility in El Paso that was not previously discussed.

## A. *Res Judicata for As-Applied Challenges*

The State makes the same res judicata arguments as to these challenges as it does for the facial challenge. The res judicata analysis is different, however, when we address the as-applied challenges because, as we suggested in *Abbott II*, the actual factual development may be different than anticipated in a facial challenge setting. We now know with certainty that the non-ASC abortion facilities have actually closed and physicians have been unable to obtain admitting privileges after diligent effort. Thus, the actual impact of the combined effect of the admitting privileges and ASC requirements on abortion facilities, abortion physicians, and women in Texas can be more concretely understood and measured. *See Hernandez v. City of Lafayette*, 699 F.2d 734, 737 (5th Cir. 1983) (addressing whether the changes are "significant" and create "new legal conditions" (internal quotation marks omitted)).

Our sister circuits have confronted the issue of how the ripeness analysis (a subsidiary consideration in the res judicata analysis discussed above) differs between a facial challenge and an as-applied challenge. The Eleventh Circuit has explained:

---

[36] Plaintiffs' expert, Dr. Grossman, used the term "Lower Rio Grande Valley" to describe the area comprising the following four counties: Starr, Hidalgo, Willacy, and Cameron. *See also Abbott II*, 748 F.3d at 597 ("The Rio Grande Valley . . . has four counties.").

No. 14-50928

Because the question of ripeness depends on the timing of the adjudication of a particular issue, it applies differently to facial and as-applied challenges.  A facial challenge asserts that a law *always* operates unconstitutionally . . . .  In the context of a facial challenge, a purely legal claim is presumptively ripe for judicial review because it does not require a developed factual record.  An as-applied challenge, by contrast, addresses whether a statute is unconstitutional on the facts of a particular case or to a particular party.  Because such a challenge asserts that a statute cannot be constitutionally applied in particular circumstances, it necessarily requires the development of a factual record for the court to consider.

*Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) (citations and internal quotation marks omitted).  The First Circuit has explained this approach as well:

[A] challenge to a rule or statute may be ripe for adjudication on the question of facial constitutionality and yet not be ripe for adjudication on the question of constitutionality as applied.  *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 121 & n.50 (1972) (upholding noise control ordinance but reserving decision on constitutionality of possible applications); *Times Film Corp. v. City of Chicago*, 365 U.S. 43 (1961) (upholding ordinance requiring licensing of films prior to public exhibition) *and Teitel Film Corp. v. Cusack*, 390 U.S. 139 (1968) (invalidating same ordinance as applied); *Adler v. Board of Education*, 342 U.S. 485 (1952) (upholding New York statutory scheme for identifying and removing subversive school teachers) *and Keyishian v. Board of Regents*, 385 U.S. 589 (1967) (invalidating portions of same statutory scheme as applied).

*Kines v. Day*, 754 F.2d 28, 31 (1st Cir. 1985).  Other courts have concluded that an as-applied challenge was not ripe although a facial challenge was ripe.  *See* 13B CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3532.3 (3d ed. 1998) ("A number of other cases in more general settings reflect similar distinctions between the ripeness of broad attacks on the legitimacy of any regulation and the nonripeness of more particular attacks on more specific

applications."); *see, e.g.*, *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 180 (4th Cir. 2009) (en banc); *Sam & Ali, Inc. v. Ohio Dep't of Liquor Control*, 158 F.3d 397, 398–400 (6th Cir. 1998); *Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1512–13 (9th Cir. 1993).

Although we agree with the State that some aspects of the as-applied challenge were extant at the time the *Abbott II* litigation was filed, some important facts occurred later, such as the actual closure of abortion facilities in Corpus Christi and El Paso and the physicians ultimately being denied admitting privileges after diligent effort. *Cf. Orix*, 212 F.3d at 895 ("[A] case is not ripe if further factual development is required." (citation omitted)). We disclaimed reliance on such facts in *Abbott II*, 748 F.3d at 589 ("Later as-applied challenges can always deal with subsequent, concrete constitutional issues."); *id.* at 599 n.14 ("To the extent that the State and Planned Parenthood rely on developments since the conclusion of the bench trial and during this appeal, we do not consider any arguments based on those facts . . . ."). Although Plaintiffs could have foreseen (and did foresee) some of these closures and admitting privilege rejections, the State suggested that we could not know these matters with certainty at the time, and we deferred consideration of these facts to a time when they were more concretely presented. That time arrived, and the district court correctly held it was not precluded from addressing the actual facts in the as-applied context. Thus, although it is a close question, we conclude that the district court did not err in denying relief to the State on this defense as to the McAllen and El Paso as-applied challenges.

*B. McAllen*

Whole Woman's Health operates a licensed abortion facility in McAllen that is not an ASC and which resides on a lot that the Plaintiffs' expert, George

W. Johannes, testified would not allow for expansion to meet the ASC construction standards. Testimony showed that four physicians[37] of Whole Woman's Health unsuccessfully sought admitting privileges from hospitals within thirty miles of the clinic, with one of the hospitals notifying them that the denial of admitting privileges "was not based on clinical competence." Whole Woman's Health has been unsuccessful in recruiting physicians with admitting privileges to work at the McAllen facility. It contends, then, that the ASC and admitting privileges requirements will prevent it from providing abortions. The McAllen clinic ceased providing abortions on November 1, 2013.

While women in the Rio Grande Valley could previously travel 150 miles or less to Corpus Christi to obtain an abortion, *see Abbott II*, 748 F.3d at 597–98, the abortion facility in Corpus Christi has now closed. The State argues that women in the Rio Grande Valley continue to be able to obtain abortions in San Antonio and Houston, where the abortion facilities now nearest to them are located. Indeed, Plaintiffs' expert, Dr. Grossman, concluded that fifty percent of the women from the Rio Grande Valley were previously obtaining abortions somewhere other than Corpus Christi, even before that clinic closed. Nonetheless, the closure of the Corpus Christi clinic means that all women in the Rio Grande Valley will have to travel approximately 235 miles[38] to San Antonio or farther to obtain an abortion. In addition, the president and CEO of Whole Woman's Health, Amy Hagstrom Miller, and a certified community health worker, Lucila Ceballos Felix, testified regarding the difficulties that

---

[37] Of those four, only Dr. Lynn is a party to the case. The other three were neither named as parties nor identified in the district court; their names were redacted from exhibits.

[38] The record reflects that the distance between McAllen, which is located near the center of the Rio Grande Valley, and the center of San Antonio is approximately 235 miles. The distance between McAllen and the ASC-compliant clinic in San Antonio, based on the address information in the parties' Joint Stipulation to Facts, is 234 miles.

women in the Rio Grande Valley faced after the McAllen facility ceased performing abortions, including that the clinic saw an increase in self-attempted abortion and some women indicated they would be unable to make the trip from McAllen to San Antonio or Houston to obtain an abortion.[39]

In *Abbott II*, relying on *Casey*, we held that having to travel 150 miles from the Rio Grande Valley to Corpus Christi to obtain an abortion was not an undue burden for purposes of the facial challenge raised there and that "*Casey* counsels against striking down a statute solely because women may have to travel long distances to obtain abortions." 748 F.3d at 598. *Casey* permitted even farther distances than 150 miles because it involved a 24-hour waiting period and women in 62 of Pennsylvania's 67 counties were required to travel for one to more than three hours one way to obtain an abortion. *See Lakey*, 769 F.3d at 303 (citing *Abbott II*, 748 F.3d at 598).[40]

We recognize that any statement of "how far is too far" will involve some imprecision. *Casey* suggested that three hours (one way) was not too far.[41]

---

[39] While some of Hagstrom Miller's testimony, and that of Ceballos Felix, appears to be hearsay (or even double hearsay in the case of the interviews by other employees of the clinic), the record is unclear whether the State objected on these grounds. Moreover, the district court relied on Hagstrom Miller's and Ceballos Felix's entire testimony for its findings that women in the Rio Grande Valley faced "practical concerns" and the State did not challenge these findings as clear error. We conclude that the district court's findings are not clearly erroneous. *See Abbott II*, 748 F.3d at 589 (noting the standard); *Reich v. Lancaster*, 55 F.3d 1034, 1045 (5th Cir. 1995) ("The trial judge's unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected." (internal quotation marks omitted)).

[40] Texas has a 24-hour waiting period, but the waiting period is reduced to 2 hours for women who certify that they live "100 miles or more from the nearest [licensed] abortion provider." *See* TEX. HEALTH & SAFETY CODE ANN. § 171.012(a)(4) (West Supp. 2014).

[41] *Casey* even suggested that doubling what amounted to a six-hour round trip was not an undue burden. 505 U.S. at 887 ("[T]he District Court did not conclude that the waiting period is [a substantial] obstacle even for the women who are most burdened by it. Hence, on the record before us . . . we are not convinced that the 24-hour waiting period constitutes an undue burden."). The district court in *Casey* noted that the waiting period doubled travel

*Abbott II* held that 150 miles is not too far and concluded that *Casey* suggested that no distance, standing alone, could be too far. 748 F.3d at 598. We hold that, in the specific context of this as-applied challenge as to the McAllen facility, the 235-mile distance presented, *combined with* the district court's findings,[42] are sufficient to show that H.B. 2 has the "effect of placing a substantial obstacle in the path of a woman seeking an abortion." *Casey*, 505 U.S. at 877. Therefore, we hold that the district court did not err in enjoining the ASC requirement "as applied" to the McAllen facility. However, we conclude that the injunction was overbroad as it fails to recognize that the Corpus Christi facility (or one like it) could reopen in the future. Thus, we modify the injunction to apply to the McAllen facility until such time as another licensed abortion facility becomes available to provide abortions at a location nearer to the Rio Grande Valley than San Antonio.

"We also must consider the proper place of H.B. 2's comprehensive and careful severability provision . . . ." *Abbott II*, 748 F.3d at 589 (citing *Leavitt v. Jane L.*, 518 U.S. 137, 138–39 (1996)). H.B. 2's severability provision directs that "every provision, section, subsection, sentence, clause, phrase, or word" is severable and that it is the intention of the legislature that only those portions

---

distances for some women who were more than three hours (one-way) from the nearest clinic. *Planned Parenthood of Se. Pa. v. Casey*, 744 F. Supp. 1323, 1352 (E.D. Pa. 1990), *aff'd in part, rev'd in part*, 947 F.2d 682 (3d Cir. 1991), *aff'd in part, rev'd in part*, 505 U.S. 833 (1992). See also *Abbott II*, 748 F.3d at 598, which cited the district court's opinion in *Casey* and noted the distances involved.

[42] *See supra* note 39 and accompanying text. We note that our resolution of this as-applied challenge does not depend on the testimony of Plaintiffs' expert, Dr. Grossman (or any related findings by the district court), as to the percentage of women in Texas driving more than 150 miles or the capacity of abortion facilities to handle any changes in, or reallocation of, demand. As we noted earlier, Dr. Grossman's testimony on the capacity of remaining ASC abortion facilities is *ipse dixit*, and the record lacks evidence on this subject. *See supra* note 34 and accompanying text.

of the act or regulations that impose an undue burden be invalidated, with all others left in place. H.B. 2, § 10(b). The implementing regulations include similar language. *See* 25 TEX. ADMIN. CODE § 139.9. It is thus necessary to "sever [H.B. 2 and the implementing regulations'] problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006). The Plaintiffs have been careful to avoid identifying which specific portions of the ASC standards contribute to the closure of abortion facilities, and the district court did not sever out only the problematic portions. We are thus forced to perform this analysis without the benefit of their input.

The regulatory standards for ASCs fall into three categories: (1) operating requirements, 25 TEX. ADMIN. CODE §§ 135.4–.17, 135.26–.27; (2) requirements related to fire prevention, general safety, and handling of hazardous materials, *id.* §§ 135.41–.43; and (3) physical-plant requirements, *id.* §§ 135.51–.56. The Plaintiffs put forth expert testimony that abortion facilities could not meet the ASC standards because they would be required to modify their existing buildings to meet the physical-plant requirements, corresponding to §§ 135.51–.56, and the fire-prevention requirements, corresponding to § 135.41.[43] In the same manner, the district court's findings

---

[43] The parties stipulated that the McAllen clinic did not comply with the ASC requirement, but did not stipulate as to the feasibility of Whole Woman's Health operating an ASC-compliant facility in the future. The parties also did not stipulate whether other ASC-compliant clinics might open in the Rio Grande Valley.

The parties offered conflicting expert testimony regarding whether Whole Woman's Health could renovate its current facility. Plaintiffs' expert, George W. Johannes, inspected several of Plaintiffs' facilities to determine how the ASC requirement would affect their operations. He testified that none of Plaintiffs' clinics, including the one in McAllen, were built on a large enough footprint to accommodate an ASC-compliant facility. Moreover, he testified that only three of the clinics had sufficient land to expand their footprints. McAllen was not one of those three. Johannes estimated that the cost of expanding these clinics ranged from $1.7 million to $2.6 million. He testified that to build a new ASC-compliant

with respect to the prohibitive effects of the ASC requirement focused on the structural modifications or new buildings that would be required by these standards. While the Plaintiffs also complained of the nursing requirements at § 135.15(a), we are not aware of any record evidence that complying with the nursing requirements would cause the closure of abortion facilities. The Plaintiffs admitted that the remaining operational requirements were comparable to the standards with which abortion facilities were already required to comply. Therefore, we conclude that the district court erred by not constraining its injunction to only those regulations that create an undue burden, namely, § 135.51–.56 (physical plant) and § 135.41 (fire prevention). *See Lakey,* 769 F.3d at 304. We modify the injunction as to McAllen to enjoin only the enforcement of the ASC physical-plant and fire-prevention standards, as described more fully below. *See* §§ 135.41, 135.51–.56.

With respect to the admitting privileges requirement, Whole Woman's

---

facility would cost $3.4 million, not including the price of land. His testimony reflects that Whole Woman's Health could not expand the McAllen facility, but would have to relocate either by obtaining new land and constructing a $3.4 million dollar facility, or leasing an existing ASC-compliant facility at a different location. Hagstrom Miller similarly testified that Whole Woman's Health in McAllen could not comply with the ASC requirement.

The state agreed that it would be expensive for Whole Woman's Health to acquire or build an ASC-compliant facility, but nevertheless argued that doing so would be feasible. The State's expert, Deborah Kitz, testified that the McAllen clinic could reduce its costs by running more efficiently and reducing the management fee it pays to Whole Woman's Health, which she testified was significantly above the average rate. The State's expert also disagreed with Plaintiffs' expert, testifying that the McAllen facility already had sufficient space to renovate into an ASC-compliant facility and would not even need to relocate.

The district court determined that the Plaintiffs' expert was more credible, finding that the cost of complying with the ASC requirement was upwards of $1.5 million for clinics that could renovate their existing facilities, and over $3 million for those that had to acquire land and construct a new facility. It determined that the McAllen clinic was an "[e]xisting clinic[], unable to meet the financial burdens imposed by the new regulatory regime, and w[ould] close as a result." On appeal, the State did not challenge these findings as clear error. Accordingly, we accept the district court's findings with respect to the prohibitive costs of upgrading or relocating the McAllen clinic.

Health presented considerable evidence that Plaintiff Dr. Lynn and three unidentified physicians working at the McAllen facility were unable to obtain admitting privileges at local hospitals for reasons other than their competence. Plaintiffs also presented evidence that they were unsuccessful in recruiting physicians to work at the McAllen facility who had admitting privileges at a local hospital.  Accordingly, we conclude that the district court's injunction of the admitting privileges requirement as applied to the McAllen facility when utilizing Dr. Lynn at that specific facility should be upheld, as described more fully below.

To sum up, we affirm in part and modify in part the district court's injunction of the admitting privileges and ASC requirements as applied to McAllen, as follows:  (1) The State of Texas is enjoined from enforcing § 135.51–.56 and § 135.41 of the ASC regulations against the Whole Woman's Health abortion facility located at 802 South Main Street, McAllen, Texas, when that facility is used to provide abortions to women residing in the Rio Grande Valley (as defined above), until such time as another licensed abortion facility becomes available to provide abortions at a location nearer to the Rio Grande Valley than San Antonio; (2) The State of Texas is enjoined from enforcing the admitting privileges requirement against Dr. Lynn when he provides abortions at the Whole Woman's Health abortion facility located at 802 South Main Street, McAllen, Texas, to women residing in the Rio Grande Valley.  The remainder of the injunction as to the McAllen facility is vacated.

## C.  *El Paso Abortion Facility*

Reproductive Services operates a licensed abortion facility in El Paso that is not an ASC.  The physician at this facility, Dr. Richter, applied for admitting privileges at three hospitals but was only able to obtain temporary

privileges at one hospital. These privileges were later revoked.[44] Reproductive Services has been unsuccessful in recruiting physicians with admitting privileges to work at the El Paso facility. After Dr. Richter's temporary admitting privileges were revoked in April 2014, the El Paso facility stopped providing abortions and eventually closed. The closest Texas abortion facility that will remain open is in San Antonio, over 550 miles away. There is an abortion facility approximately twelve miles away in Santa Teresa, New Mexico. Prior to H.B. 2, more than half of the women who obtained abortions at the Santa Teresa facility were from El Paso.

The State argues the closure of the El Paso abortion facility will not impose an undue burden because women in this area can travel to the Santa Teresa facility. The Plaintiffs contend that this argument is precluded by *Jackson Women's Health Organization v. Currier,* 760 F.3d 448, 457–58 (5th Cir. 2014), *petition for cert. filed*, S. Ct. No. 14-997 (Feb. 18, 2015), where we held that a statute that would have the effect of closing the only abortion facility in the state could not be upheld based upon evidence of facilities in other states. In that case, although Mississippi's admitting privileges requirement for abortion physicians was shown to cause the closure of the only abortion clinic in the state, women could travel to abortion facilities outside the state. *Id.* at 451, 455. The State argues that *Jackson* is distinguishable

---

[44] Plaintiffs state that the hospital denied Dr. Richter admitting privileges because she was an abortion provider. As emphasized in *Abbott II*, Texas and federal law prohibit discrimination on this basis and Texas provides a private cause of action to challenge such discrimination. *See* 748 F.3d at 598 & n.13 (citing TEX. OCC. CODE ANN. §§ 103.002(b), 103.003, and 42 U.S.C. § 300a-7(c)). This undermines the argument that the admitting privileges requirement is the *cause* of the closure of the facility since the suggestion is that the cause is actually unlawful discrimination for which state law provides Dr. Richter a remedy. However, because we conclude that the closure of the El Paso facility, whatever its cause, does not create an undue burden on a woman's right to choose an abortion, we need not address this issue further.

because, unlike in Mississippi, H.B. 2 will not cause the closure of all abortion facilities in Texas. The Plaintiffs did not respond to this argument in their merits briefs. The motions panel acknowledged *Jackson* and noted that "the situation in Texas is markedly different from that in Mississippi" because H.B. 2 would not close the last clinic in the state. *Lakey*, 769 F.3d at 304. However, the motions panel declined "to construe [*Jackson*'s] broad language so narrowly in [an] emergency stay proceeding." *Id.* As discussed above, a motions panel proceeding is an abbreviated one; having now considered the matter in full, we conclude that *Jackson* is distinguishable.

In *Jackson*, we relied on *State of Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938), an equal protection case in which the University of Missouri denied admission to Gaines because he was African-American and offered him a stipend to attend school in an adjacent state. We explained that "*Gaines* simply and plainly holds that a state cannot lean on its sovereign neighbors to provide protection of its citizens' federal constitutional rights." 760 F.3d at 457. In this case, unlike in *Gaines* and *Jackson*, the State has not completely shunted its responsibility onto other states. H.B. 2 does not result in the closure of all abortion providers in the state: at least eight ASCs will continue to provide abortions in Texas. *See Lakey*, 769 F.3d at 304 ("Given the panel's reliance on *Gaines*, the panel may have meant to apply its limitation only to states where all the abortion clinics would close."). In addition, the principle relied on by *Jackson* has little traction in this as-applied challenge because prior to H.B. 2, half of the patients at the Santa Teresa clinic came from El Paso, which is in the same cross-border metropolitan area as Santa Teresa.[45]

---

[45] We note that this analysis would likely be different in the context of an international border, and we disclaim any suggestion that the analysis here applies to a city across an international border from a United States city in question.

This demonstrates that Texas women regularly *choose to have an abortion in New Mexico* independent of the actions of the State.   Given these facts particular and peculiar to El Paso, it would ignore reality in this as-applied challenge to "focus[] solely on the effects within the regulating state," as we did in *Jackson*.  760 F.3d at 457.

Unlike the city of Jackson, Mississippi, which is 175–200 miles from the borders of Tennessee and Louisiana, the evidence in this case shows that El Paso and Santa Teresa are part of the same metropolitan area, though separated by a state line, and that people regularly go between the two cities for commerce, work, and medical care.  No such situation was presented by the evidence or considered by the panel in *Jackson*.  Taking the Plaintiffs' version of *Jackson*, a clinic just over the line in Texarkana, Arkansas, would not be a fact that could be considered by a court in Texarkana, Texas.  An injunction is an equitable remedy, and it would be wholly inequitable to ignore the reality of metropolitan areas that straddle state lines and in which people regularly travel back and forth in commerce.  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982) (explaining that "an injunction is an equitable remedy," which does not "issue[] as of course or to restrain an act the injurious consequences of which are merely trifling" (citation and internal quotation marks omitted)).  To the extent that *Jackson* can be read to so provide, it is dicta as that situation was simply not presented in that case.

Therefore, although the nearest abortion facility in Texas is 550 miles away from El Paso, there is evidence that women in El Paso can travel the short distance to Santa Teresa to obtain an abortion and, indeed, the evidence is that many did just that before H.B. 2.  Accordingly, because H.B. 2 does not place a substantial obstacle in path of those women seeking an abortion in the El Paso area, we hold that the district court erred in sustaining Plaintiffs' as-

No. 14-50928

applied challenge in El Paso.

## VII.  Plaintiffs' Cross-Appeal

The Plaintiffs appeal the district court's dismissal of their equal protection and unlawful delegation claims.  For substantially the same reasons as the district court stated in its order dismissing these claims, we affirm the judgment of the district court on these claims.

Accordingly, the district court's judgment is AFFIRMED in part, MODIFIED in part, VACATED in part, and REVERSED in part.