# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

––––––––––

No. 17-30397

––––––––––

United States Court of Appeals
Fifth Circuit

**FILED**
January 18, 2019

Lyle W. Cayce
Clerk

JUNE MEDICAL SERVICES, L.L.C.,
on Behalf of Its Patients, Physicians, and Staff,
Doing Business as Hope Medical Group for Women;
JOHN DOE 1; JOHN DOE 2,

                                        Plaintiffs–Appellees,

versus

DOCTOR REBEKAH GEE, in Her Capacity as
Secretary of the Louisiana Department of Health and Hospitals,

                                        Defendant−Appellant.

.

–––––––––––––––––––

Appeal from the United States District Court
for the Middle District of Louisiana

–––––––––––––––––––

ON PETITION FOR REHEARING EN BANC
Opinion 905 F.3d 787 (Sept. 26, 2018)

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM:

Treating the petition for rehearing en banc as a petition for panel rehearing, the petition for panel rehearing is DENIED. The court having been polled at the request of one of its members, and a majority of the judges who

are in regular active service and not disqualified not having voted in favor (FED. R. APP. P. 35 and 5TH CIR. R. 35), the petition for rehearing en banc is DENIED.[*] In the poll, 6 judges voted in favor of rehearing (Chief Judge Stewart and Judges Dennis, Southwick, Graves, Higginson, and Costa), and 9 judges voted against rehearing (Judges Jones, Smith, Owen, Elrod, Haynes, Willett, Ho, Engelhardt, and Oldham).

ENTERED FOR THE COURT:

　　　　/s/　Jerry E. Smith　　　　.
JERRY E. SMITH
United States Circuit Judge

---

[*] Judge Duncan is recused and did not participate in the consideration of the petition.

JAMES L. DENNIS, Circuit Judge, joined by Judges Higginbotham, Graves, and Higginson, dissenting:[1]

I respectfully but strenuously dissent from the court's refusal to rehear en banc the panel's two-judge majority opinion upholding as constitutional the Louisiana Unsafe Abortion Protection Act ("Act 620"), which requires an abortion provider to have admitting privileges at a hospital within thirty miles of the site of an abortion. The panel majority opinion is in clear conflict with the Supreme Court's decision in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ("*WWH*"), holding unconstitutional an almost identical Texas admitting privileges requirement that served as a model for Act 620. The panel majority's attempt to distinguish *WWH* is meritless because it is based on an erroneous and distorted version of the undue burden test required by *WWH* and *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992). The panel majority also improperly reverses the district court's well-supported factual findings regarding the devastating effects on women's rights to abortion that will result from Louisiana's admitting-privileges requirement, instead retrying those facts de novo at the appellate level. The panel majority refuses to acknowledge, much less discuss, these mistakes, even though the panel dissenter, Judge Higginbotham, cogently pointed them out. *See June Medical*, 905 F.3d 787, 816 (5th Cir. 2018) (Higginbotham, J., dissenting). A majority of the en banc court repeats this mistake, apparently content to rely on strength in numbers rather than sound legal principles in order to reach their desired result in this specific case. The important constitutional issues involved in this case deserve consideration by the full court more so than most others for which the court has granted en banc rehearing. It is disconcerting

---

[1] Judge Higginbotham dissents from the denial of rehearing en banc for the reasons stated in his dissent from the panel decision and joins Judge Dennis's dissent.

and telling that a panel and now the active circuit judges by slim majorities have refused to even acknowledge, much less openly discuss, the implications this case will have on our important doctrines of stare decisis and clear error review of trial court factual findings.

## I. BACKGROUND

### A.  Act 620

Act 620 was signed into law in Louisiana in June 2014.  It requires "that every physician who performs or induces an abortion shall 'have active admitting privileges at a hospital that is located not further than thirty miles from the location at which the abortion is performed or induced.'"  "[A]ctive admitting privileges" means "the physician is a member in good standing of the medical staff of a hospital that is currently licensed by the department, with the ability to admit a patient and to provide diagnostic and surgical services to such patient."

Act 620 reflects its legislative environment and Louisiana's longstanding opposition to abortions.  Louisiana has legislated multiple restrictions on access to abortions, such as an ultrasound requirement, a mandatory 24-hour waiting period, and a trigger ban that would reinstate Louisiana's total ban on abortions in the event *Roe v. Wade*, 410 U.S. 113 (1973) is abrogated.  Advocacy groups and the bill's primary sponsor, Representative Katrina Jackson, expressed an intent to restrict abortion rather than further women's health and safety through the passage of Act 620.  For example, Representative Jackson stated that the Act would "build on our past work to protect life in our state" and would protect "unborn children."  An anti-abortion advocacy group sent Representative Jackson an email praising the bill because of its similarity to the Texas law that would ultimately be at issue in *WWH*, noting that Texas's

4

law had "tremendous success in closing abortion clinics and restricting abortion access in Texas."[2]

## B.   *WWH*

While this lawsuit challenging Act 620 was pending in the district court, the Supreme Court's decision in *WWH* invalidated the nearly identical Texas admitting privileges requirement.  In so doing, the Supreme Court set out several basic legal principles that the district court applied in the instant case.  First, while recognizing that states have a legitimate interest in ensuring that abortions are conducted safely, the Court reiterated its prior holding in *Casey* that a statute that "has the effect of placing a substantial obstacle in the path of a woman's choice" is unconstitutional even though it furthers a valid state interest.  *WWH*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877) (quotation marks omitted).  Explicitly referring to *Casey*'s undue burden test as a balancing test, the Court emphasized that "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right."  *Id.*

The Court in *WWH* invalidated this circuit's prior formulation of the undue burden test because it failed to "consider the burdens a law imposes on abortion access together with the benefits those laws confer."  *Id.*  Our prior, abrogated test isolated the benefits and burdens from each other analytically, rather than considering the benefits and burdens together, and upheld a state abortion restriction as "'constitutional if: (1) it does not have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an

---

[2] Texas's H.B. 2 was basically identical to the Louisiana law at issue here: it contained the same so-called "admitting-privileges requirement," mandating that abortion providers "have active admitting privileges at a hospital that . . . is located not further than 30 miles from the location at which the abortion is performed or induced."  *WWH*, 136 S. Ct. at 2299 (quoting TEX. HEALTH & SAFETY CODE § 171.0031(a)).

abortion of a nonviable fetus; and (2) it is reasonably related to (or designed to further) a legitimate state interest.'"[3] *Id.* (quoting *Whole Woman's Health v. Cole*, 790 F.3d 563, 572 (5th Cir. 2015)). The first prong of this test, according to the Court in *WWH*, was directly contrary to *Casey*, as it "may be read to imply that a district court should not consider the existence or nonexistence of medical benefits when considering whether a regulation of abortion constitutes an undue burden." *Id.* Instead, as the Court explained, the burdens and benefits of the law must be weighed against each other.[4] *Id.*

Applying these principles, the Supreme Court in *WWH* reversed the Fifth Circuit's holding that Texas's admitting privileges requirement was constitutional, holding instead that "there is adequate legal and factual support for the District Court's conclusion" that "the legislative change imposed an 'undue burden' on a woman's right to have an abortion." *Id.* at 2310–11. The Court affirmed the district court's finding that Texas's admitting privileges requirement "brought about no . . . health-related benefit," and the requirement "does not serve any relevant credentialing function." *Id.* at 2311, 2313. "At the same time," it held, "the admitting-privileges requirement places a 'substantial obstacle in the path of a woman's choice.'" *Id.* at 2312 (quoting *Casey*, 505 U.S. at 877). Specifically, the Court determined that "the record contains sufficient evidence" to support the district court's finding that half of Texas's clinics closed because of Texas's H.B. 2, meaning "fewer doctors, longer

---

[3] This court first applied this abrogated, two-part analysis in the context of admitting privileges requirements in *Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*, 748 F.3d 583, 590 (5th Cir. 2014).

[4] Likewise, the *WWH* Court concluded that the second prong of the Fifth Circuit's prior formulation of the undue burden test, requiring only that the requirement be "reasonably related to (or designed to further) a legitimate state interest," was "wrong to equate the judicial review applicable to the regulation of a constitutionally protected personal liberty with the less strict review applicable where, for example, economic legislation is at issue." *Id.*

6

waiting times, and increased crowding" for women seeking abortions in Texas. *Id.* at 2313.

## C.     The District Court's Decision in the Instant Case

Faced with a challenge to Act 620 by several abortion clinics and doctors, the district court properly declared Act 620 facially invalid and permanently enjoined its enforcement. Employing the principles set forth in *WWH*, the district court made detailed findings of fact, some necessarily based on credibility determinations, and reached the following conclusions: (1) Act 620 does nothing to protect women's health; (2) it imposes serious burdens on a woman's choice; and (3) those burdens vastly outweigh the nonexistent benefits. Based on ample record evidence, the district court determined that, because abortions are extremely safe, low-risk procedures and admitting privileges are not necessary to address any unlikely complications that may arise, Act 620 "provides no benefits to women and is an inapt remedy for a problem that does not exist." The district court then determined that "[a]dmitting privileges also do not serve 'any relevant credentialing function,'" and "[a]s the record in this case demonstrates, physicians are sometimes denied privileges, explicitly or de facto, for reasons unrelated to [medical] competency." This finding was premised on extensive evidence about the multitude of reasons the doctors were actually denied admitting privileges in Louisiana hospitals:

> [B]oth by virtue of by-laws and how privileges applications are handled in actual practice, hospitals may deny privileges or decline to consider an application for privileges for myriad reasons unrelated to competency. Examples include the physician's expected usage of the hospital and intent to admit and treat patients there, the number of patients the physician has treated in the hospital in the recent

7

past, the needs of the hospital, the mission of the hospital, or the business model of the hospital. Furthermore, hospitals may grant privileges only to physicians employed by and on the staff of the hospital. And university-affiliated hospitals may grant privileges only to faculty members.

Further, at least two doctors were denied privileges explicitly because of the hospitals' (or hospitals staffs') objections to their active abortion practices, and the state's expert conceded that Louisiana law allows hospitals to reject applicants for privileges because of such objections.

Before proceeding to the burdens side of the Supreme Court's balancing test, the district court made specific findings about the current abortion providers' inability to obtain admitting privileges required by Act 620. The district court found that "notwithstanding the good faith efforts of Does 1, 2, 4, 5, and 6 to comply with the Act by getting active admitting privileges at a hospital within 30 miles of where they perform abortions, they have had very limited success for reasons related to Act 620 and not related to their competence."[5] Additionally, the district court determined that Doe 3 would cease his abortion practice due to Act 620 if it causes him to be "the last physician performing abortion in either the entire state or in the northern part of the state" because he fears "he [would] become an even greater target for anti-abortion violence." The district court found this testimony "credible and supported by the weight of other evidence in the record."

The district court then found that Act 620 imposed numerous burdens on a woman's choice. The district court determined that only one physician, Doe 5, would be left performing abortions in the state if the Act were to go into

---

[5] The doctors' names in this case are under seal and were referred to as Doe 1 through 6 in the district court and appellate decisions, using masculine pronouns even though some are women. I mirror that practice here.

effect, and "this one physician will not be able to perform 10,000 procedures per year," which is roughly how many abortion procedures women seek in Louisiana. Two of the three remaining abortion clinics would be forced to close as they would have no physician with legally sufficient admitting privileges.[6] The remaining clinic, with the one remaining physician in Louisiana, would be unable to meet the annual demand for roughly 10,000 abortions in the state. Recruiting new abortion doctors with admitting privileges would become even more difficult. Given that the remaining abortion doctor, Doe 5, has performed almost 3,000 abortions per year in the past, the district court found that, based on the total demand of approximately 10,000 abortions, "approximately 70% of the women in Louisiana seeking an abortion would be unable to get an abortion in Louisiana." Further, the district court determined that "[t]here would be no physician in Louisiana providing abortions between 17 weeks and 21 weeks, 6 days gestation." Women in poverty, who make up a high percentage of women seeking abortions in Louisiana, would be especially burdened by the closures, because any travel, child care, and required time off work would burden them disproportionately. And women living in northern Louisiana "will face substantially increased travel distances to reach [the only remaining] abortion provider in New Orleans," with women in Bossier and Shreveport, for example, facing a drive of approximately 320 miles. Finally, the district court found substantial burdens, even for women who would be able to access an abortion clinic. These women would "face lengthy delays, pushing them to later gestational ages with associated risks"; "candidates for medication abortion would have difficulty obtaining an abortion before that method becomes

---

[6] By the time of the district court's ruling, two additional clinics, Causeway and Bossier, had closed, and the district court drew no inferences as to whether Act 620 caused those closures.

9

unavailable"; "women toward the end of the first trimester would have difficulty obtaining an appointment before they reach 16 weeks"; and "[w]omen past 16 weeks . . . will be left without any provider at all."

Based on these detailed findings, the district court concluded that the record did not support a finding that the Act would benefit women's health, "but it is clear that the Act will drastically burden women's right to choose abortions." Accordingly, the district court found it was "bound by the Supreme Court's clear guidance to reach the same result [as in *WWH*] and strike down the Act."

## D.    The Panel Majority's Opinion

Despite the district court's detailed factual findings and faithful application of *WWH*, the panel majority impermissibly reviews the evidence de novo and ultimately concludes that the district court erred by overlooking "remarkabl[e] differen[ces]" between the facts in this case and in *WWH*. *June Medical*, 905 F.3d at 791. According to the panel majority, "[h]ere, unlike in Texas, the Act does not impose a substantial burden on a large fraction of women." *Id.* The panel majority reaches this conclusion by purporting to distinguish *WWH*: "Unlike Texas, Louisiana presents some evidence of a minimal benefit. And, unlike Texas, Louisiana presents far more detailed evidence of Act 620's impact on access to abortion," such that "[i]n light of the more developed record presented to the district court and to us, the district court . . . clearly and reversibly erred," because "[i]n contrast to Texas's H.B. 2, . . . Act 620 does not impose a substantial burden on a large fraction of women."[7] *Id.* at 805.

---

[7] Though nothing in *WWH* indicates that only the burdens identified there were cognizable for purposes of the undue burden analysis, the panel majority recognizes only the four burdens discussed in *WWH*: (1) clinic closures; (2) difficulties faced by providers in

Importantly, the panel majority's conclusion that no undue burden exists here rests on the false premise that the district court found that "Act 620 provides minimal benefits," *id.* at 806, but this conclusion is not based on a fair reading of the district court's findings. The panel majority selects isolated instances in which the district court stated that Act 620's benefits were "minimal." In fact, if one reads all the instances in which the district court addressed this subject, it becomes clear that the district court found the Act conferred *no* benefit at all.[8] Turning to the burdens, the panel majority

---

obtaining privileges; (3) increased driving distances; and (4) fewer doctors, longer waiting times, and increased crowding, based on the common-sense assumption that the remaining clinics did not have capacity to absorb the demand for abortions. *June Medical*, 905 F.3d. at 804 (citing *WWH*, 136 S. Ct. at 2313). In so limiting its analysis, the majority ignores the additional burdens identified by the district court specific to Louisiana, including that women in poverty in Louisiana, a state with much higher poverty rates than Texas, would face higher burdens than others.

[8] The district court refers on two occasions to the benefit here being "minimal," in one instance describing its earlier finding in conjunction with its original ruling and noting it had found the benefits to be "minimal" in that earlier ruling, and in the other instance referring to the benefits as "minimal, at best." While some of its findings use somewhat imprecise language, overall, the district court's repeated references to the lack of medical benefit make it clear that its finding was that Act 620 conferred no benefit for purposes of weighing against the burdens of Act 620 under the undue burden test. The district court made the following statements about the Act's benefits: "Requiring Abortion Practitioners to Obtain Admitting Privileges Confers No Medical Benefit"; "[Act 620] provides no benefits to women and is an inapt remedy for a problem that does not exist"; "the Act would do little, if anything, to promote women's health"; "[b]ased on the evidence admitted to the record, the facts found herein, and all reasonable inferences drawn from those facts, the Court concludes that the admitting privileges requirement . . . provides no significant health benefits to women"; "[t]he record is devoid of any credible evidence that the Act will have a measurable benefit to women's health"; "[a]s in *WWH*, Act 620 'does not benefit patients and is not necessary'" (quoting *WWH*, 136 S. Ct. at 2315); "[e]ven if Act 620 could be said to further women's health to some marginal degree, the burdens it imposes far outweigh any such benefit, and thus the Act imposes an unconstitutional undue burden"; "[f]or the reasons outlined above, the Court finds that Act 620 is unconstitutional on its face under *Casey* and *WWH*," because "[t]he Act would create substantial obstacles for women seeking abortion in Louisiana without providing any demonstrated benefit to women's health or safety" and "any marginal health benefits would be dramatically outweighed by the obstacles the restriction erects to women's access to their constitutional right to abortion"; "Act 620 'vastly increase[s] the obstacles confronting women seeking abortions' in Louisiana 'without providing any benefit to women's health capable of withstanding any meaningful scrutiny'" (quoting *WWH*, 136 S. Ct. at 2319).

overturns the district court's finding that Act 620 would exclude all but one of the six abortion doctors in Louisiana from performing abortions. *June Medical*, 905 F.3d at 807. Instead, according to the panel majority, these doctors largely "sat on their hands" rather than diligently taking steps to obtain admitting privileges. *Id.* Specifically, the panel majority finds de novo that Does 2, 5, and 6 "could likely obtain privileges," and "Doe 3 is definitively not burdened,"[9] *id.* at 810, such that June Medical "failed to establish a causal connection between the regulation and [the alleged] burden," *id.* at 807. Based on its findings regarding the good faith efforts of each doctor, the panel majority concludes that the only finding supported by the record "is that no clinics will likely be forced to close on account of the Act," and thus, no burden will result.[10] *Id.* at 810–11.

## II. THE PANEL MAJORITY'S ERRORS

### A. The Panel Majority's Articulation of the Undue Burden Test is Wrong

The panel majority begins by setting out its interpretation of the principles set forth in *WWH*. Elaborating on the undue burden framework, the panel majority's opinion holds that "[t]he proper reading of *WWH* is a

---

[9] The panel majority cited to Doe 3's testimony that he would retire, pointing out that he initially said he would only stop practicing if he were the only abortion doctor left in the entire state, but later his "story changed," when he testified "he would now cease practicing were he the only remaining abortion provider in *northern* Louisiana." *Id.* at 810. According to the panel majority, then, "Doe 3's shifting preference as to the number of remaining abortion providers is entirely independent of the admitting-privileges requirement" because it rests on a personal choice. *Id.*

[10] The panel majority reaches this result by finding that the abortions provided in the past by the only doctor who acted in good faith (Doe 1) could be split between Does 2 and 3. *Id.* at 812. This appellate-level factual finding ignores Doe 3's testimony that he would be unable to increase his capacity due to his private OB/GYN practice. *See id.* at 828, n.33 (Higginbotham, J., dissenting).

combination of the views offered by [the parties]," such that (1) "even regulations with a minimal benefit are unconstitutional only where they present a substantial obstacle to abortion," and (2) "[a] minimal burden even on a large fraction of women does not undermine the right to abortion." *Id.* at 803. This formulation is wrong and reintroduces the same misreading of *Casey* the Supreme Court rejected in *WWH*.

The effect of the panel majority's reading of *WWH* is that a court may be permitted to weigh the burdens of an abortion restriction against the benefits of that restriction only if that burden itself imposes a "substantial obstacle." *Id.* at 803 (holding that "not every burden creates a 'substantial obstacle'" and "even regulations with a minimal benefit are unconstitutional only where they present a substantial obstacle to abortion"). Under the panel majority's articulation, if a court determines that any potential burden on women is not substantial, then that court need not even consider whether there are any benefits of the law, much less weigh those benefits against the burdens the law creates. This formulation runs directly contrary to the Supreme Court's admonition to this court in *WWH* that "[t]he rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *WWH*, 136 S. Ct. at 2309. Tellingly, in *WWH*, the Supreme Court overturned this circuit's prior test that contained this same erroneous reading of *Casey*, holding that it "may be read to imply that a district court should not consider the existence or nonexistence of medical benefits when considering whether a regulation of abortion constitutes an undue burden." *Id.* The majority repeats this mistake, once again misapprehending *WWH* and *Casey* and setting forth a test that fails to truly balance an abortion restriction's benefits against its burdens.

Contrary to the panel majority's view, which eviscerates the balancing required by *Casey* and *WWH*, a proper application of the Supreme Court's guidance in this case is straightforward and leads to one possible result: Louisiana's Act 620, like the nearly identical Texas law struck down in *WWH*, has no medical benefit and will restrict access to abortion. Such a restriction is surely undue. *June Medical*, 905 F.3d at 829 (Higginbotham, J., dissenting) ("I fail to see how a statute with no medical benefit that is likely to restrict access to abortion can be considered anything but 'undue.'"). *WWH* and *Casey* require this result, and the panel majority's contrary conclusion creates bad law for our circuit that runs directly contrary to the Supreme Court's jurisprudence.

**B.  The Panel Majority Did Not Review the District Court's Findings for Clear Error and, In Retrying the Facts De Novo, Reaches Incorrect Results**

In addition to misreading *WWH*'s and *Casey*'s undue burden standard, the panel majority also fails to faithfully apply the well-established "clear error" standard of review to the district court's factual findings. Judge Higginbotham's dissent from the panel majority's opinion correctly catalogues the panel majority's many failures to give proper deference to the district court, which saw and heard the witnesses and determined their credibility, but the following examples demonstrate how egregious and pervasive the panel majority's retrial of the facts was.

The district court determined that Act 620 serves no relevant credentialing function. The panel majority ignored this finding, however, and incorrectly claims the district court instead found that a minimal benefit existed because requiring admitting privileges served a credentialing function. *June Medical*, 905 F.3d at 805. This runs counter to the district court's express

14

finding that the "[a]dmitting privileges . . . do not serve 'any relevant credentialing function,'" and that doctors may be granted or denied privileges by hospitals for business and other reasons unrelated to medical competency. As the dissent noted, the district court's finding that no credentialing function would be served by Act 620 was well supported by the record, and not subject to reversal on clear error review. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) (requiring meaningful deference of the clear error standard "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts"). Further, the panel majority's de novo factual finding that Act 620 will serve some "minimal" benefit, impermissibly undertaken at the appellate level, is unsupported by the evidence in the record. For example, hospitals in Louisiana are free to deny or simply ignore a provider's application for admitting privileges for any reason at all, including objections to abortion.[11] Notably, at least two doctors were denied admitting privileges precisely *because of* their abortion practices.

Even more troubling is the panel majority's assertion "that the district court clearly erred in saying that all doctors had put forth a good-faith effort to obtain privileges." *June Medical*, 905 F.3d at 808. Not only does this analysis err as to the proper legal standard, it also ignores the district court's detailed and well-supported factual findings about each doctor's substantial efforts to obtain admitting privileges. The district court set out extensive

---

[11] The district court correctly determined that "both by virtue of by-laws and how privileges applications are handled in actual practice, hospitals may deny privileges or decline to consider an application for privileges for myriad reasons unrelated to competency," including how much use the hospital expects the physician to make of the facilities, "the number of patients the physician has treated in the hospital in the recent past, the needs of the hospital, the mission of the hospital or the business model of the hospital."

15

reasoning as to why each doctor's efforts were sufficient, recounting their unsuccessful attempts to obtain admitting privileges at various hospitals within the thirty-mile radius and that they were either denied expressly or de facto. Here, too, the majority opinion's contrary finding is baseless. For example, as Judge Higginbotham's dissent points out, the majority determined that Doe 2 should have applied to two additional hospitals—Christus and Minden—but, in doing so, the panel majority ignored the fact that "Christus requires applicants to be able to admit fifty patients annually (something Doe 2 cannot do) and evidence that Doe 1 applied and was unable to obtain privileges from either hospital (a finding the majority credits)." *June Medical*, 905 F.3d at 830 n.40 (Higginbotham, J., dissenting). As Judge Higginbotham further discusses in his dissent, the panel majority's conclusion that Doe 5 did not make good-faith efforts blatantly ignores his efforts in gathering information about admitting privileges, targeting hospitals at which he was most likely to obtain privileges, and his inability, despite his efforts, to find coverage from staff doctors, which is required by all the eligible hospitals in the Baton Rouge area. *See id.* at 825–26.

One additional example highlights the panel majority's failure to apply clear-error review in this case. The district court determined that Doe 3's testimony was credible and that "[a]s a result of his fears of violence and harassment, Doe 3 has credibly testified that if he is the last physician performing abortion in either the entire state or in the northern part of the state, he will not continue to perform abortions." Therefore, the district court found Doe 3 would stop performing abortions and that the resulting clinic closure and reduction in abortion capacity in the state would be attributable to Act 620. Despite this finding, the panel majority determines de novo that Doe 3's anticipated retirement from abortion practice was "independent of the

admitting-privileges requirement" of Act 620. *See June Medical*, 905 F.3d at 810. Ordinarily, this court declines to reweigh a district court's credibility determinations. *Reich v. Lancaster*, 55 F.3d 1034, 1052 (5th Cir. 1995) ("Defendants' assertion that the trial court clearly erred in this respect essentially rests upon a line of reasoning that asks us to reweigh the evidence and decide credibility questions differently. We decline this invitation."). Not so here. Ignoring record evidence about Doe 3's fears of violence, his problems obtaining coverage from other physicians due to their animosity against abortion providers, and the fact that anti-abortion activists have previously picketed his home and his neighbors' homes and distributed threatening flyers, the panel majority summarily, and erroneously, dismisses the evidence and the district court's findings as to Act 620's effect on Doe 3.[12]

## C. The Panel Majority's Causation Standard Imposes a Heightened, Individualized Showing of Causation Not Required by the Court in *WWH*

The Court in *WWH* held the evidence in that case was sufficient to support the district court's finding of causation—that the Texas admitting-privileges requirement had in fact caused the burdens it identified—based only on "the timing of the clinic closures." *WWH*, 136 S. Ct. at 2313. In requiring plaintiffs to demonstrate causation to a much higher level of probability by showing that each doctor made good-faith efforts to obtain admitting privileges, not only does the panel majority set aside the district court's well-supported factual findings and inferences of causation, but it also holds that,

---

[12] In conjunction with its examination of the evidence before it, the district court found that Louisiana's expert on Act 620's benefits "suffered from paucity of [relevant] knowledge or experience" and the weight of his testimony was "diminished by his bias." In stark contrast and without explanation, the panel majority expressly relies on this discredited expert in making de novo factual findings. *See June Medical*, 905 F.3d at 805–06.

as a matter of law, it is entitled to impose a more demanding, individualized standard of proof than the Supreme Court did in *WWH*. *June Medical*, 905 F.3d at 807–08. The panel majority justifies this heightened, individualized showing requirement by pointing out that, "[u]nlike the litigants in *WWH*, who presented only generalities concerning admitting privileges, the parties here provide the bylaws for the relevant hospitals." *Id.* According to the majority, because Louisiana had fewer abortion facilities and doctors to start with than in Texas, it was free to "examine each abortion doctor's efforts to comply with the requirements of Act 620," and the "specific by-laws of the hospitals to which each [doctor] applied." *Id.* at 807. But if such individualized proof was not required in *WWH*, why is it required here? Tellingly, the panel majority essentially concedes that it requires a higher showing of causation than in *WWH*, stating that its "more intricate analysis yields a richer picture of the statute's true impact, the sort of obstacles it imposed," and "allows us to scrutinize more closely whether [plaintiffs have] met [their] burden." *Id.* Raising the bar beyond what the Supreme Court has required in analyzing an almost identical law is simply wrong.

The panel majority supports its heightened showing requirement by reasoning that "[w]ere we not to require such causation, the independent choice of a single physician could determine the constitutionality of a law." *Id.* Not so. This reasoning, which is based on the panel majority's finding of fault or lack of diligence of individual doctors, obscures the real question at issue here: Whether Act 620 would cause doctors to lose their ability to perform abortions at certain clinics, thereby leading those clinics to close. *See WWH*, 136 S. Ct. at 2313 ("In our view, the record contains sufficient evidence that the admitting-privileges requirement *led to the closure of half of Texas' clinics, or thereabouts*." (emphasis added)). Even if some element of "personal choice"

18

did influence an individual doctor's ability to obtain admitting privileges, that doctor would not have been faced with navigating that obstacle but for Act 620's medically benefitless requirement.

## D. The Non-Existent Credentialing Function Identified by the Panel Majority Serves No Cognizable State Interest

The panel majority erred in making its de novo finding that Act 620 serves some indefinite credentialing function. *See June Medical*, 905 F.3d at 818 (Higginbotham, J. dissenting) (noting "[t]he district court made no such finding" and that the record is devoid of support for such a finding). But assuming arguendo that Act 620 serves a credentialing function, the panel majority fails to explain how further credentialing advances Louisiana's interest in protecting maternal health. *Roe v. Wade* recognized that a "State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." 410 U.S. at 150. But nothing about the supposed "credentialing function" of Act 620 indicates that it would further an abortion patient's safety. The record demonstrates that abortions in Louisiana are extremely safe and complications are exceedingly rare, and the panel majority does not contend otherwise.[13] Furthermore, given that hospitals typically base admitting-privileges decisions on business or other reasons unrelated to a doctor's medical competency, and may even deny privileges based on animus toward abortion, it strains credulity that a state seeking to ensure its abortion doctors

---

[13] Indeed, the district court found that "[a]bortion is one of the safest medical procedures in the United States," and "[t]he prevalence of any complication in first trimester abortion in the outpatient setting is approximately 0.8%," while "[t]he prevalence of major complications requiring treatment in a hospital is 0.05%" in the first trimester and "approximately 1.0%" in the second trimester. The risks associated with a D&C procedure performed after a miscarriage, by contrast, are greater than those associated with first-trimester abortions.

were highly credentialed would turn to the ill-fitting, indirect approach of hospital admitting privileges. And the requirement that these privileges be at a hospital within a certain geographic location makes little sense if the true goal is to use admitting privileges to raise the medical competency of abortion doctors.

**E.** **The Panel Majority Turns a Blind Eye to the Additional Real-World Burdens Act 620 Will Impose on Women**

In overturning the district court's well-supported factual findings, the panel majority does not consider the many other burdens the district court determined will result from Act 620's enforcement beyond the four burdens discussed in *WWH*. In addition to the clinic closures, reduced access to abortion, increased driving times, and increased wait times and crowding identified in *WWH*, *see* 136 S. Ct. at 2313, the district court determined that Act 620 will impose additional and equally serious burdens on women seeking abortions in Louisiana. If Act 620 goes into effect, "[t]here would be no physician in Louisiana providing abortions between 17 weeks and 21 weeks, 6 days gestation," the legal limit in Louisiana. Thus, in the final stage of a pregnancy in which women may legally seek abortion in Louisiana, they will be left with no options whatsoever, a burden the panel majority completely ignores. The district court found that longer wait times for an earlier abortion would compound this problem, as more and more women would find themselves without a scheduled procedure before the end of 16 weeks gestation, and then would be completely without recourse. Further, the district court properly determined that women in poverty would be disproportionately affected by Act 620's burdens. Louisiana's large class of poverty-stricken women would face added difficulties affording transportation and childcare for the legally required back-to-back visits, which is to say

20

nothing of the cost of the abortion itself. Additionally, these women will be forced to take time off from work, likely without compensation, and travel to New Orleans, where they must stay overnight to comply with Louisiana's required 24-hour waiting period. These burdens will no doubt be untenable for the high number of women in poverty who seek abortions in Louisiana, who make up a high percentage of women seeking abortions in Louisiana, and who are no less entitled than other women to this constitutionally protected healthcare right.

## F.  The Panel Majority's Large-Fraction Analysis is Incorrect

In addition to determining that "no woman would be *unduly* and thus unconstitutionally burdened by Act 620," the panel majority also holds that the law does not burden a large fraction of women. *June Medical*, 905 F.3d at 813. Based on the district court's factual findings, which should be affirmed, there would be an undue burden on a large fraction of women, because under those findings, 70% of women seeking abortions in Louisiana would be unable to obtain one, clearly constituting an undue burden on a large fraction of women.

The panel majority argues that, under its own de novo factual findings, a large fraction of women will not be burdened. But even based on those improper appellate de novo findings, the panel majority's calculation of the large fraction is nevertheless incorrect. The calculation is defective for the same reason as the panel majority's formulation of the substantial burden test is flawed: It "may be read to imply that a district court should not consider the existence or nonexistence of medical benefits when considering whether a regulation of abortion constitutes an undue burden." *WWH*, 136 S. Ct. at 2309. Furthermore, as Judge Higginbotham points out in his dissent, the panel majority's "large fraction" analysis is overly formalistic, because the Supreme Court's guidance on this point "does not require the court to engage in rote

21

mathematical calculations but instead directs the court to focus its inquiry on those who will be actually restricted by the law and determine whether the law will operate as a substantial obstacle for that population."[14] *See June Medical*, 905 F.3d at 832 (Higginbotham, J., dissenting).

***

For these reasons, I respectfully dissent from the denial of rehearing en banc.

---

[14] Judge Higginbotham's dissent also rightly observes that, in making de novo factual findings that fail to recognize most of the burdens Act 620 would cause, the panel majority should have simultaneously reduced the "relevant denominator" to base its unnecessary math on that same, purportedly smaller group. Specifically, because "the relevant denominator must be 'those women for whom the provision is an actual rather than an irrelevant restriction,'" *WWH*, 136 S. Ct. at 2320 (quoting *Casey*, 505 U.S. at 895) (cleaned up), the panel majority, which found de novo that only Hope clinic would be affected, should have used as the denominator the population of women who would have utilized Hope clinic, rather than all women seeking abortions in Louisiana. *See June Medical*, 905 F.3d at 833 (Higginbotham, J., dissenting).

STEPHEN A. HIGGINSON, Circuit Judge, dissenting from denial of rehearing en banc:

I favor full court rehearing to assess whether our court preserves a Louisiana law that is equivalent in structure, purpose, and effect to the Texas law invalidated in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016). I am unconvinced that any Justice of the Supreme Court who decided *Whole Woman's Health* would endorse our opinion. The majority would not, and I respectfully suggest that the dissenters might not either. As Justice Thomas wrote, "[u]nless the Court abides by one set of rules to adjudicate constitutional rights, it will continue reducing constitutional law to policy-driven value judgments until the last shreds of its legitimacy disappear." 136 S. Ct. at 2330. As Justice Alito wrote, the "patent refusal to apply well-established law in a neutral way is indefensible and will undermine public confidence in the Court as a fair and neutral arbiter." *Id.* at 2331. The panel majority acknowledges the governing rule that "unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right," *June Med. Servs. L.L.C. v. Gee*, 905 F.3d 787, 803 (5th Cir. 2018), and accepts the district court's finding "that Act 620 provides minimal benefits," *id.* at 807. Its fact-finding that Act 620 reduces Louisiana's capacity to provide abortions by 21%[1] therefore is enough to abrogate the Act under Supreme Court law, both long-standing and recent.

That the issues at the heart of this case are profoundly sensitive is more reason for us, as a full court, to be sure we reconcile our reasoning with recent Supreme Court direction.

---

[1] *See June Med. Servs.*, 905 F.3d at 812 (noting Doe 1, driven from practice by Act 620, performed 2,100 abortions per year); *id.* at 814 (noting 10,000 abortions in Louisiana per year). This, of course, is down from the district court's fact-finding, after trial, of a 55% to 70% reduction—unquestionably a substantial obstacle to women seeking an abortion.